NO. 17-1480

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

In re: Google Inc. Cookie Placement Consumer Privacy Litigation

Theodore H .Frank,
*Appellant.*

On Appeal from the United States District Court
for the District of Delaware, No. 12-md-2358

Opening Brief of Appellant Theodore H. Frank

COMPETITIVE ENTERPRISE INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
Theodore H. Frank
Adam E. Schulman
1310 L Street, NW, 7th Floor
Washington, D.C. 20005
(202) 331-2263

*Attorneys for Appellant Theodore H. Frank*

# Table of Contents

Table of Contents.................................................................................................. i

Table of Authorities ............................................................................................ ii

Statement of Subject Matter and Appellate Jurisdiction................................... 1

Statement of the Issues ....................................................................................... 1

Statement of Related Cases and Proceedings .................................................... 3

Statement of the Case ......................................................................................... 3

      A.    Journalists expose questionable Google cookie practices, and the FTC obtains a settlement. ............................................................. 3

      B.    Private class-action litigation is less successful, and settles. ..................... 5

      C.    The *cy pres* recipients.............................................................. 7

      D.    Class member Frank objects. ................................................... 8

      E.    The district court approves the Settlement. ........................... 11

Summary of Argument ..................................................................................... 12

Argument........................................................................................................... 18

I.    As this Court has recognized, *cy pres* is rife with conflicts of interest and requires narrow cabining. ............................................................ 18

II.    The district court erred in approving a *cy pres*-only settlement without "sufficient direct benefit" where there was undisputed evidence that a claims process was feasible. ............................................................ 23

      A.    The district court erred in permitting *cy pres* when it was feasible to make payments to the class........................................ 24

      B.    In the alternative, if it is impossible to create a settlement with "distributable" funds, class certification was an error of law................. 32

III.    Even if *cy pres* were appropriate, the defendant's and class counsel's "significant prior affiliation" with the *cy pres* recipients made settlement approval legal error. ........................................................ 34

Conclusion......................................................................................................... 40

Combined Certifications.................................................................................... 42

# Table of Authorities

Cases

*In re Aqua Dots Prod. Liab. Litig.*,
    654 F.3d 748 (7th Cir. 2011) ............................................. 32

*In re Baby Products Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) ..................2, 7, 9, 12-16, 19, 23-25, 27-32, 34-35, 40

*In re BankAmerica Corp. Sec. Litig.*,
    775 F.3d 1060 (8th Cir. 2015) .....................1, 9, 14-15, 19, 23, 24, 30, 36

*In re Bayer Corp. Combination Aspirin Products Mktg. and Sales Practices Litig.*,
    No. 09-md-2023,
    2013 U.S. Dist. LEXIS 125555 (E.D.N.Y. Sep. 3, 2013)...............................29-30

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013) ...............................................23-24

*In re Carrier iQ, Inc., Consumer Privacy Litig.*,
    2016 WL 4474366 (N.D. Cal. Aug. 25, 2016)...................................25-30

*In re Chase Bank USA NA "Check Loan" Contract Litig.*,
    No. 09-md-02032 (N.D. Cal.) .............................................. 22

*In re Cmty. Bank of N. Va & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277 (3d Cir. 2005)............................................ 34

*Daniels v. Aeropostale West*,
    No. C 12-05755 WHA,
    2014 U.S. Dist. LEXIS 74081 (N.D. Cal. May 29, 2014)................................... 33

*Dennis v. Kellogg Co.*,
    697 F.3d 858 (9th Cir. 2012)........................2-3, 21, 24, 29, 34, 37, 39-40

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002) ....................................................... 1

*Dewey v. Volkswagen, AG*,
    681 F.3d 170 (3d Cir. 2012) ............................................... 9

*Diamond Chemical Co. v. Akzo Nobel Chemicals BV*,
    517 F. Supp. 2d 212 (D.D.C. 2007) ....................................... 21

*In re Dry Max Pampers Litig.*,
    724 F.3d 713 (6th Cir. 2013) ....................................................2, 17, 38, 40

*Eubank v. Pella Corp.*,
    753 F.3d 718 (7th Cir. 2014) ............................................................... 38

*Fraley v. Facebook*,
    966 F. Supp. 2d 939 (N.D. Cal. 2013) ....................................9-10, 25-30

*Fraley v. Facebook*,
    2012 WL 5838198 (N.D. Cal. Aug. 17, 2012)..................................... 25

*Gallego v. Northland Group*,
    814 F.3d 123 (2d Cir. 2016) .........................................................2, 17, 32

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
    55 F.3d 768 (3d Cir. 1995) .............................................................32-33

*In re Google Buzz Privacy Litig.*,
    2011 WL 7460099 (N.D. Cal. Jun. 2, 2011) ...................................... 7-8

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
    806 F.3d 125 (3d Cir. 2015) ...........................................................1, 3-5

*In re Google Referrer Header Privacy Litig.*,
    87 F. Supp. 3d 1122 (N.D. Cal. 2015),
    *appeal pending*, No. 15-15858 (9th Cir.) ..................................... 7-8, 30, 39

*In re Hydroxycut Mktg. & Sales Practices Litig.*,
    No. 09-md-2087 BTM (KSC),
    2013 U.S. Dist. LEXIS 165225 (S.D. Cal. Nov. 19, 2013) .............................. 39

*Ira Holtzman, C.P.A. & Assocs. v. Turza*,
    728 F.3d 682 (7th Cir. 2013)................................... 18-20, 23, 24, 30-31

*Jackson v. Phillips*,
    96 Mass. 539 (1867) ............................................................................ 18

*Klier v. Elf Atochem N.A., Inc.*,
    658 F.3d 468 (5th Cir. 2011) ...........................................1, 15, 23, 24

*Koby v. ARS National Services, Inc.*,
    846 F.3d 1071 (9th Cir. 2017) ......................................................31, 33

*Lane v. Facebook,*
    696 F.3d 811 (9th Cir. 2012) ............................................................... 30, 37-40

*In re Lupron Mkt'g & Sales Practices Litig.,*
    677 F.3d 21 (1st Cir. 2012) ........................................................................ 23

*Marek v. Lane,*
    134 S.Ct. 8 (2013) ............................................................................... 15, 18

*Masters v. Wilhelmina Model Agency, Inc.,*
    473 F.3d 423 (2d Cir. 2007) ....................................................................... 23

*McDonough v. Toys 'R' Us,*
    80 F. Supp. 3d 626 (E.D. Pa. 2015) .........................................................28-29

*In re Microsoft Corp. Antitrust Litig.,*
    185 F. Supp. 2d 519 (D. Md. 2002) ............................................................. 21

*Mirfasihi v. Fleet Mortgage Corp.,*
    356 F.3d 781 (7th Cir. 2004) ...................................................................18-19

*Nachshin v. AOL, LLC,*
    663 F.3d 1034 (9th Cir. 2011) ....................................... 2, 9, 18-20, 22, 36, 38, 40

*Pearson v. NBTY, Inc.,*
    772 F.3d 778 (7th Cir. 2014) ............................... 1, 9, 15, 19, 24, 26, 28, 38

*Pearson v. Target Corp.,*
    No. 1:11-cv-07972 (N.D. Ill.) ..................................................................... 29

*Perkins v. Am. Nat'l Ins. Co.,*
    No. 3:05-cv-100 (CDL), 2012 WL 2839788 (N.D. Ga. Jul. 10, 2012)...........20-21

*Piambino v. Bailey,*
    757 F.2d 1112 (11th Cir. 1985).................................................................22-23

*Radcliffe v. Experian Info. Solutions,*
    715 F.3d 1157 (9th Cir. 2013) ............................................................... 37, 40

*Reynolds v. Beneficial Nat'l Bank,*
    288 F.3d 277 (7th Cir. 2002) ...................................................................... 39

*SEC v. Bear, Stearns & Co. Inc.*,
    626 F. Supp. 2d 402 (S.D.N.Y. 2009) ................................................. 21, 36

*Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................ 22

*In re Southwest Airlines Voucher Litig.*,
    799 F.3d 701, 714 (7th Cir. 2015) ....................................................... 40

*Tyson Foods Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ............................................................................ 23

*In re Walgreen Co. Stockholder Litig.*,
    832 F.3d 718 (7th Cir. 2016) ................................................... 2, 17, 32-33

*Zepeda v. Paypal*,
    2014 WL 718509 (N.D. Cal. Feb. 24, 2014) ....................................... 26

*Zepeda v. Paypal*,
    2015 WL 6746913 (N.D. Cal. Nov. 5, 2015) .................................. 26, 29

## Rules and Statutes

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1332(d) ........................................................................................ 1

Fed. R. App. Proc. 4(a)(1)(A) ...................................................................... 1

Fed. R. App. Proc. 4(a)(7)(B) ...................................................................... 1

Fed. R. Civ. Proc. 12(b)(6) ........................................................................... 5

Fed. R. Civ. Proc. 23 ................................................................................... 22

Fed. R. Civ. Proc. 23(a)(4) ............................................................ 2, 17, 32, 34

Fed. R. Civ. Proc. 23(b)(2) ..................................................................... 6, 34

Fed. R. Civ. Proc. 23(b)(3) ................................................................... 17, 34

Fed. R. Civ. Proc. 23(e) .......................................................................... 17, 31

Fed. R. Civ. Proc. 23(g)(4) ................................................................ 32, 34

Fed. R. Civ. Proc. 23(h) ...................................................................... 12

Fed. R. Civ. Proc. 58(a) ........................................................................ 1

U.S. Const., Art. III ............................................................................ 23


Other Authorities

Angwin, Julia and Robert Faturechi,
    *Stanford Promises Not to Use Google Money for Privacy Research*,
    ProPublica (Sep. 23, 2014), available at
    http://www.propublica.org/article/stanford-promises-not-to-use-
    google-money-for-privacy-research ........................................................ 7

American Law Institute,
    Principles of the Law of Aggregate Litig.§ 3.07 (2010)
    ....................................................... 3, 15, 23, 24, 28, 36, 38, 40

American Law Institute,
    Principles of the Law of Aggregate Litig.§ 3.07(a) (2010) ...................... 2

American Law Institute,
    Principles of the Law of Aggregate Litig.§ 3.07 *comment* (b) (2010)
    ....................................................... 2, 16, 19, 24, 36-37, 40

Beisner, John, *et al.*,
    Cy Pres: A Not So Charitable Contribution to Class Action
    Practice (2010) .................................................................. 14

Bronstad, Amanda,
    *Cy pres awards under scrutiny*,
    Nat'l L. J. (Aug. 11, 2008) ...................................................... 14

Chasin, Chris J.,
    *Modernizing Class Action Cy Pres Through Democratic Inputs*,
    163 U. Penn. L. Rev. 1463 (2015) ............................................... 35

Fisher, Daniel,
    *Odds of a Payoff in Consumer Class Action? Less Than a Straight Flush*,
    FORBES.COM, May 8, 2014 ..................................................................................... 26

Frank, Theodore H.,
    Statement before the House Judiciary Committee
    Subcommittee on the Constitution and Civil Justice,
    *Examination of Litigation Abuse* (Mar. 13, 2013) ............................14, 19, 22, 35-36

Frank, Theodore H.,
    *Cy Pres Settlements*,
    CLASS ACTION WATCH (March 2008) .................................................................. 19

Frankel, Allison,
    *Legal Activist Ted Frank Cries Conflict of Interest, Forces O'Melveny and Grant*
    *& Eisenhofer to Modify Apples Securities Class Action Deal*,
    AMERICAN LAWYER LIT. DAILY, November 30, 2010 .............................................

Hechinger, John and Rebecca Buckman,
    *The Golden Touch of Stanford's President*,
    WALL ST. J. (Feb. 25, 2007) ...................................................................................... 7

Jones, Ashby,
    *A Litigator Fights Class-Action Suits*,
    WALL ST. J. (Oct. 31, 2011) .........................................................................................

Koppel, Nathan,
    *Proposed Facebook Settlement Comes Under Fire*
    WALL ST. J (Mar. 2, 2010) ..................................................................................... 14

Krueger, George & Judd Serotta,
    Op-Ed, *Our Class-Action System is Unconstitutional*,
    WALL ST. J., Aug. 6, 2008 ............................................................................................

Levie, Shay,
    *Reverse Sampling:*
    *Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*,
    79 GEO. WASH. L. REV. 1065 (2011) .................................................................... 31

Liptak, Adam,
    *When Lawyers Cut Their Clients Out of the Deal*,
    N.Y. TIMES (Aug. 13, 2013) ............................................................................. 14, 22

Liptak, Adam,
*Doling Out Other People's Money*,
N.Y. TIMES (Nov. 26, 2007) ....................................................14, 20, 22

MacLean, Pamela A.,
*Competing for Leftovers*,
CALIFORNIA LAWYER 15 (Sept. 2011) ................................................... 21

Parloff, Roger,
*Google and Facebook's new tactic in the tech wars*,
FORTUNE (Jul. 30, 2012).........................................................7-8, 20-21

Redish, Martin H. *et al.*,
*Cy Pres Relief & the Pathologies of the Modern Class Action:*
*A Normative and Empirical Analysis*,
62 FLA. L. REV. 617 (2010).........................................14-15, 18-19, 21-22

Stanford Center for Internet and Society,
*About Us,* (2016 version)...................................................................35-36

Stanford Center for Internet and Society,
*About Us,* (2017 version)...................................................................... 36

Tidmarsh, Jay,
*Cy Pres and the Optimal Class Action*,
82 GEO. WASH. L. REV. 767 (2013)...................................................... 16

Toobin, Jeffrey,
*The Solace of Oblivion*,
THE NEW YORKER (Sep. 29, 2014) ....................................................... 7

Wasserman, Rhonda,
*Cy Pres in Class Action Settlements*,
88 U.S.C. L. REV. 97 (2014)................................................................ 20

Yospe, Sam,
*Cy Pres Distributions in Class Action Settlements*,
2009 COLUMBIA BUS. L. REV. 1014........................................................ 14

## Statement of Subject Matter and Appellate Jurisdiction

The district court had federal question jurisdiction under, *inter alia*, the Class Action Fairness Act, 28 U.S.C. § 1332(d). JA50;[1] *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 135 n.20 (3d Cir. 2015) ("*Google Cookie*").

This court has appellate jurisdiction under 28 U.S.C. § 1291. The court's final order overruling class member Theodore H. Frank's objection and approving settlement issued on February 2, 2017. JA4. Frank filed a notice of appeal on March 1, 2017. JA1. This notice is timely under Fed. R. App. P. 4(a)(1)(A). (Although there has been no separate Fed. R. Civ. P. 58(a) final judgment, Frank may proceed with an appeal of the final decision. Fed. R. App. P. 4(a)(7)(B).) Frank, as a class member who objected to settlement approval below, JA147, has standing to appeal a final approval of a class action settlement without the need to intervene formally in the case. *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

## Statement of the Issues

1.     The Fifth, Seventh, and Eighth Circuits hold that a *cy pres* distribution is "supposed to be limited to money that can't feasibly be awarded" to the class. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 784 (7th Cir. 2014) (rejecting $1.1 million *cy pres* residual in class with over 10 million members); *Klier v. Elf Atochem N.A., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011); *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1063-66 (8th Cir. 2015);

---

[1] "JA" refers to the Joint Appendix. "Dkt." refers to the docket below, No. 12-md-2358 (D. Del.).

*accord* AMERICAN LAW INSTITUTE, PRINCIPLES OF THE LAW OF AGGREGATE LITIG. ("*ALI Principles*") § 3.07(a) (2010). This Court requires district courts to ensure that a settlement provides "sufficient direct benefit" so that class members remain the "foremost beneficiaries" of the class action. *In re Baby Products Antitrust Litig.*, 708 F.3d 163, 170, 176, 179, 181 (3d Cir. 2013). Did the district court err when it approved a class action settlement that consisted solely of *cy pres* distribution of millions of dollars when Frank presented undisputed evidence that similar settlements have successfully distributed similar sums to similarly-sized classes through a claims process? (Raised at JA163-166, 183-85, 270-72; Ruled on at JA12.)

2.     In the alternative, courts have held that actions that will not confer a meaningful benefit upon absent class members cannot satisfy the Rule 23(a)(4) or Rule 23(g)(4) requirement of adequacy of representation. *E.g.*, *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *cf. Gallego v. Northland Group*, 814 F.3d 123, 129-30 (2d Cir. 2016). If it is true that any distribution to the class was not feasible, did the district court err as a matter of law in certifying the class? (Raised at JA171-72, 274; Ruled on at JA6).

3.     "A *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." *ALI Principles* § 3.07 *comment (b)*. *Accord Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011) (criticizing *cy pres* where "the selection process may answer to the whims and self interests of the parties [or] their counsel" (internal citation omitted)); *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (disapproving *cy pres* where a defendant might be

using "previously budgeted funds" to make the sort of donations it has long made). Did the district court err as a matter of law when it failed to apply § 3.07 and approved a *cy pres* distribution that paid money to a charity for which lead class counsel serves as chairman of the board and at least four organizations with previously budgeted donations from Google? (Raised at JA167-71, 274-75; Ruled on at JA13).

## Statement of Related Cases and Proceedings

This case has previously been before this Court reviewing a granted motion to dismiss on the underlying claims. *Google Cookie*, 806 F.3d 125 (3d Cir. 2015).

## Statement of the Case

This is a case about the legality of a settlement of a class action that provides millions of dollars to the attorneys, and zero dollars to the class. Class members, who waive all rights to damages under the settlement, receive the same benefit whether or not they opt out.

## A.    Journalists expose questionable Google cookie practices, and the FTC obtains a settlement.

The background facts underlying the litigation are detailed at *Google Cookie*, 806 F.3d at 130-34, but we summarize briefly. Internet users' web browsers permit users to interact with—or "surf" —the Internet. Internet "cookies" are used to track an individual person's activities and communications on a particular website, as well as across the Internet. The information can be used to assist with security, login status, and functionality; third-party companies often negotiate with websites to use cookies to track users' Internet use across multiple websites to be able to serve targeted

advertising, which is worth more to advertisers than advertising that is not personalized. JA57-69. Google serves advertisements to be displayed on the host websites based on the data tracked by their cookies, and splits the advertising revenue with the host. *Google Cookie*, 806 F.3d at 130-31.

Browsers permit users to control what cookies track, and offer this feature as a means of protecting privacy. Apple's Safari browser in particular advertises that it allows for a "worry-free web" because it blocks third-party cookies by default. JA69-70. Google's privacy policy and webpages indicated that the Safari defaults were sufficient to protect users' privacy with respect to Google's cookies. JA73-74.

A February 17, 2012 *Wall Street Journal* article, however, revealed that Google had, starting in 2011, used code in its cookies to bypass the privacy settings on Safari to use third-party cookies to track users' information. JA70-85. Google voluntarily ceased the practice shortly before the publication of the *Journal* article. The FTC immediately opened an investigation, and the United States filed a complaint and proposed settlement in the Northern District of California in August 2012 that was entered as an order November 16, 2012; Google paid the U.S. a $22.5 million fine and agreed to an injunction against the practice (*i.e.*, Google would issue code to instruct existing cookies to expire). JA211-21. Google reached a second settlement with state attorneys general including a similar assurance of voluntary compliance and a $17 million fine in 2013. JA 222-43.

**B.    Private class-action litigation is less successful, and settles.**

Meanwhile, in the wake of the publicity, plaintiffs brought multiple putative class actions against Google under a variety of theories of federal and state law, which were consolidated as MDL No. 2358 in the District of Delaware. The district court dismissed under Fed. R. Civ. P. 12(b)(6) in 2013, and this Court reversed in part with respect to some California state-law claims in November 2015. *Google Cookie*, 806 F.3d at 134-35, 153. On remand, plaintiffs asserted rights to compensatory damages, punitive damages, and restitution. JA124. As plaintiffs' ultimately unsuccessful *certiorari* petition was pending, but before any substantive briefing on class certification or the merits, the parties settled in June 2016. JA131.

Under the settlement (JA128-46), Google creates a $5.5 million fund, but none of that money would go to class members. Rather, after up to $2.5 million in attorneys' fees and costs (Settlement § 11), incentive awards of up to $1,000 to named plaintiffs, and up to $500,000 in administrative costs are paid to the settlement administrator (Settlement § 7.1), the remainder of the fund would be divided evenly among up to ten *cy pres* recipients who agree to devote funds to "promote public awareness and education, and/or to support research, development, and initiatives, related to the security and/or privacy of Internet browser [sic]." JA133 (Settlement § 5.3). Google agreed to "clear sailing"; they agreed not to challenge a fee request of up to $2.5 million of the fund. JA136 (Settlement § 11.2). The parties ultimately agreed to six *cy pres* recipients: (1) Berkeley Center for Law & Technology; (2) Berkman Center for Internet & Society at Harvard University; (3) Center for Democracy & Technology (Privacy & Data Project); (4) Public Counsel; (5) Privacy Rights Clearinghouse; and (6) Center for

Internet & Society at Stanford University. JA4; Dkt. 166. (The record does not disclose the names of four proposed *cy pres* recipients that Google vetoed under the procedure of Settlement § 5.3.1, or if any proposed *cy pres* recipients refused to agree to the terms of the agreement. JA133; JA252.) Google's only other settlement obligation was giving an "assurance of remediation"—that they were complying with the federal injunction to expire improperly-placed cookies. *Compare* JA132 (Settlement § 5.1) *with* JA216-17.

With exclusions (other than exclusions of judges and judges' immediate family members) not relevant here, the Settlement creates a (b)(2) opt-out Settlement Class of

> All persons in the United States of America who used Apple Safari or Microsoft Internet Explorer web browsers and who visited a website from which Doubleclick.net (Google's advertising serving service) cookies were placed by the means alleged in the Complaint.

JA6; Settlement § 2.3. Class members would release all claims to damages. JA130; JA135 (Settlement §§ 2.25, 10.1).

The settling parties never identified or submitted evidence about the precise size of the class or how the class would be ascertainable. In filings and the district court opinion, the class size is described as "millions." JA103; JA12.

The district court preliminarily approved the settlement and authorized notice. Dkt. 166. Notice was provided only through publication, and not to individual class members. Dkt. 167-5.

Class counsel requested $2.5 million in fees and expenses, uncontested by Google. Dkt. 168. The fee request was solely based on the $5.5 million size of the settlement fund, and purported to be less than the lodestar of the twelve firms that worked on the case; class counsel made no claim that the "assurance of remediation"

entitled them to fees. Dkt. 168-1. The briefing made no mention of this Court's decision in *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013). *Id.*

## C.  The *cy pres* recipients.

Stanford graduates Larry Page and Sergey Brin famously founded Google, and Stanford received hundreds of millions of dollars of Google stock as payment for allowing Google to use technology Page and Brin developed while at Stanford. Julia Angwin and Robert Faturechi, *Stanford Promises Not to Use Google Money for Privacy Research*, PROPUBLICA (Sep. 23, 2014), available at http://www.propublica.org/article/stanford-promises-not-to-use-google-money-for-privacy-research (last accessed June 23, 2017). Google has provided millions of dollars of funding for the Stanford Center for Internet and Society at Stanford Law School, which supported Google's positions on limiting copyright protections, and whose scholars have otherwise publicly spoken in support of Google's litigation positions, including on privacy issues. JA170; *e.g.,* John Hechinger and Rebecca Buckman, *The Golden Touch of Stanford's President*, WALL ST. J. (Feb. 25, 2007); Jeffrey Toobin, *The Solace of Oblivion*, THE NEW YORKER (Sep. 29, 2014). In some years, the majority of the Stanford Center's funding has come from Google. JA170; Roger Parloff, *Google and Facebook's new tactic in the tech wars*, FORTUNE (Jul. 30, 2012) (noting criticism in *Google Buzz* case that *cy pres* is steered to organizations that are currently paid by Google to lobby for or to consult for the company).

Google is a regular donor to the Berkman Center, Stanford Center, Berkeley Center, and Center for Democracy and Technology. JA170; JA192-210. Many of these recipients have also received previous Google *cy pres* money. *In re Google Referrer Header*

*Privacy Litig.*, 87 F. Supp. 3d 1122 (N.D. Cal. 2015), appeal pending, No. 15-15858 (9th Cir.); *In re Google Buzz Privacy Litig.*, 2011 WL 7460099 at *3 (N.D. Cal. Jun. 2, 2011); Parloff, *supra* (noting conflict of interest with Stanford Center); Dkt. 172 at 14. Google may have had relationships with the other two recipients; it never disclosed the full scope of its relationship with the recipients, despite Frank's demand that the district court require such disclosure. JA170-71.

Google does not appear to have previously donated money to Public Counsel. However, co-lead class counsel Brian Strange is chairperson of the board of Public Counsel. JA189; JA244.

## D.     Class member Frank objects.

Theodore H. Frank timely objected to the settlement approval, *cy pres* recipients, class certification, and fee request on August 8, 2014. JA147-249. Frank documented his class membership with more detail than the three class representatives in the case. *Compare* JA179 *with* JA50-51.[2]

---

[2] Class counsel asserted in passing that Frank had failed to prove he was a class member, Dkt. 172 at 19-20, but did not submit any evidence on the question or move to strike his objection. Nothing in the preliminary approval order's objection requirements (Dkt. 166 at 5-7); or in the description of the putative class in the complaint (JA48; JA102-03), in the preliminary approval order (Dkt. 166 at 1-2), or in the settlement (JA128) is inconsistent with Frank's evidence of class membership. The district court made no explicit factual findings on the question one way or the other, but stated at the fairness hearing that it did not anticipate it would rule against Frank on his standing to object, and that Frank's counsel did not need to argue the question or produce more evidence. JA268.

Frank is the founder of the Center for Class Action Fairness, part of the non-profit Competitive Enterprise Institute. JA180-82. The Center's objections have won tens of millions of dollars for class members and shareholders and numerous landmark appellate decisions protecting class members' rights. JA181. Frank has argued some of the leading decisions on *cy pres*, including this Circuit's *Baby Products*; *In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060 (8th Cir. 2015); *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014); and *Nachshin v. AOL, LLC*, 663 F.3d 1034 (9th Cir. 2011). JA180-81. While the Center has lost some of the dozens of objections it has brought in the last eight years, it has won the majority of its federal appeals, including both of the appeals it has prosecuted in the Third Circuit. *Baby Products*; *Dewey v. Volkswagen, AG*, 681 F.3d 170 (3d Cir. 2012).

Frank argued that *cy pres* was inappropriate at all: while it would be impossible to pay every class member, the $5.5 million was sufficient to fund either a claims process or a lottery distribution for the class, and thus improperly favored third parties over the class members to whom class counsel owed a fiduciary obligation. JA163-66. Evidence under oath from a settlement administrator was that claims rates in similar settlements without individualized notice were under one percent. JA164. And even if, somehow, the number of claims was too high, the claiming class members could be paid by lottery. Frank identified numerous settlements that found it feasible to combine a claims process for a large class with a small sum of money; in particular, the settlement for a similarly large class of over 100 million members in *Fraley v. Facebook, Inc.* was able to have a claims process after the district court rejected the possibility of a *cy pres*-only settlement, and was able to distribute $15 per class member because so few class

members made claims. JA163-64 (citing 966 F. Supp. 2d 939 (N.D. Cal. 2013)); JA183-84 (listing a dozen examples). If it was really not feasible to distribute any money to class members, then class certification was inappropriate, because of the lack of adequate representation: the release benefited only Google, the "assurance of remediation" was independently worthless, and the class was no better off than if there was no litigation at all. JA166-67; JA171-72.

Frank further objected that at least five of the *cy pres* recipients were impermissibly tainted with conflict of interest because of their pre-existing relationships with class counsel and with Google, and thus not "independent and free from conflict"; the donations to Google's preexisting beneficiaries reflected "a change in accounting entries" and undermined the value of the settlement. JA167-71.

Finally, Frank objected to the proposed $2.5 million fee request under *Baby Products*. Frank didn't object to the idea of Google resolving its liability for $5.5 million, but objected that the entirety of the settlement benefit was being split between class counsel, a non-profit group affiliated with class counsel, and entities previously affiliated with Google. If fee awards are indifferent between distribution to the class and distribution to *cy pres*, then attorneys never have reason not to benefit their own affiliated non-profits instead of their clients. JA172-75.

Class counsel emphasized repeatedly to the court that Frank was the only objector to the settlement. They did not dispute that a claims process would be a feasible means of distributing money to the class or that the number of claims would be low enough to permit distribution. They only argued that direct distribution to every class member would be infeasible, something Frank never contested, and asserted

without evidence or explanation that a claims process would not work. They argued that Frank had previously unsuccessfully objected to claims-made procedures. Dkt. 172. Class counsel argued that the *cy pres* recipients were appropriate and asserted that lead counsel was just one of seventy board members on Public Counsel. *Id.*; JA251-52. The evidence class counsel did submit to the court was not about the factual claims Frank made about distributability, but putatively to support a wide variety of *ad hominems*, accusing Frank of an "anti-class-action agenda," of "boilerplate" objections, and suggesting there was something unseemly about the fact that Frank's charitable employer had corporate donors (including Google) and the fact that Frank received a salary. Dkt. 172; *see also* JA182.

Class counsel further argued that their fee request of 44% of the fund was less than lodestar and appropriate. Dkt. 172.

Google filed no response to the objections and submitted no data into the record identifying the scope of their prior relationships with any of the proposed beneficiaries.

## E.     The district court approves the Settlement.

After a fairness hearing (JA253), the district court approved the settlement. JA4.

The district court held *cy pres* appropriate because of "the substantial problems of identifying the millions of potential class members and then of translating their alleged loss of privacy into individual cash amounts." JA12. "Direct monetary payments to absent class members" would be "logistically burdensome, impractical, and economically infeasible," the court held. The court did not reach Frank's actual objection on the question of whether a claims process or lottery could provide direct

benefit to the class. Nor did the court address Frank's objection to class certification, instead erroneously stating that "[t]here have been no objections [to certification]." JA6. The court made no findings about the size of the class other than characterizing it as in "the millions." JA12.

The court held there was no conflict of interest in the *cy pres* recipients, relying on a Ninth Circuit decision and a district court approval of a similar Google settlement. JA13.

The court did reduce the Rule 23(h) request from $2.5 million to 35% of the settlement fund plus expenses, or $2.016 million. JA14-15.

Frank timely appealed. JA1.

## Summary of Argument

In *Baby Products,* this Court noted the importance of payments to the class taking priority over *cy pres*:

> *Cy pres* distributions … substitut[e] for that direct compensation an indirect benefit that is at best attenuated and at worse illusory. *Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because the inclusion of a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class.

708 F.3d at 173 (cleaned up). Because of this,

> We add today that one of the additional inquiries for a thorough analysis of settlement terms is the degree of direct benefit provided to the class. In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to

claimants' estimated damages, and the claims process used to determine individual awards. Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds.

We note that this inquiry needs to be, as much as possible, practical and not abstract. If the parties have not on their own initiative supplied the information needed to make the necessary findings, the court should affirmatively seek out such information.

*Id.* at 174 (cleaned up).

Here, however, "the number of individual awards" was zero, and there was no "claims process": class counsel made *no* effort to distribute *any* money to the class. The district court held that this was alright, because it would be admittedly infeasible to divide the limited settlement fund amongst every class member. But if this is the standard, it creates an exception that swallows the rule to the *Baby Products* requirement of "sufficient direct benefit": all class action settlements reflect compromise, and nearly every class action involving consumers—including the *Baby Products* settlement!—is only able to avoid *de minimis* compensation by establishing a claims procedure that compensates only a portion of the class. The only record evidence in this case was that similar cases with similar ratios of settlement fund size to class size were able to create a claims process that distributed more than *de minimis* amounts to class members. JA183-85.

Worse, the *cy pres* recipients were chosen with an eye to the interests of class counsel and Google. Class counsel is chairman of the board of one of the recipients. JA244. Google is a regular donor to four of the others, for example regularly giving money to Stanford institutions that far outstrips the *cy pres* award in this case. JA192-210.

This isn't a new benefit to the class, but an illusory change in accounting entries, and the district court failed to conduct any inquiry into the extent of that donation history.

This Court should reverse, and give guidance to lower courts that the fact that some *cy pres* settlements may hypothetically pass muster does not mean that anything goes.

"In recent years, federal district courts have disposed of unclaimed class action settlement funds after distributions to the class by making *cy pres* distributions. Such distributions have been controversial in the courts of appeals" with many circuits "criticiz[ing] and severely restrict[ing] the practice." *BankAmerica*, 775 F.3d at 1063 (citing cases including *Baby Products*) (cleaned up). *See generally* Martin H. Redish, Peter Julian & Samantha Zyontz, *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617 (2010) ("Redish"); JOHN BEISNER, et al., CY PRES: A NOT SO CHARITABLE CONTRIBUTION TO CLASS ACTION PRACTICE 13 (2010); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013); Nathan Koppel, *Proposed Facebook Settlement Comes Under Fire*, WALL ST. J. (Mar. 2, 2010); Adam Liptak, *Doling Out Other People's Money*, N.Y. TIMES (Nov. 26, 2007) ("*Doling Out*"); Sam Yospe, *Cy Pres Distributions in Class Action Settlements*, 2009 COLUM. BUS. L. REV. 1014; Amanda Bronstad, *Cy pres awards under scrutiny*, NAT'L L. J. (Aug. 11, 2008); Theodore H. Frank, Statement before the House Judiciary Committee Subcommittee on the Constitution and Civil Justice, *Examination of Litigation Abuse* (Mar. 13, 2013), *available at* https://cei.org/sites/default/files/Testimony%20-%20Cy%20Pres.pdf ("Frank Statement"). As the leading law review article notes, *cy pres* awards can "increase the likelihood and absolute amount of attorneys' fees awarded,"

"without directly, or even indirectly, benefitting the plaintiff." Redish, 62 FLA. L. REV. at 660-61. *Cy pres* "creates the illusion of class compensation." *Id.* at 623.

In *Marek v. Lane*, Chief Justice Roberts concurring in the denial of *certiorari* noted the possible need of the Supreme Court "to clarify the limits" of *cy pres* "including when, if ever, such relief, should be considered." 134 S.Ct. 8, 9 (2013) (citing Redish).

Since *Marek*, two more appellate courts have joined *Klier* and taken the position endorsed by Section 3.07 of the *ALI Principles*: "A *cy pres* award is supposed to be limited to money that can't feasibly be awarded to the intended beneficiaries, here consisting of the class members." *Pearson*, 772 F.3d at 784 (rejecting $1.13 million *cy pres* residual when distribution possible to 4.7 million class members); *accord BankAmerica*, 775 F.3d at 1063-64 (rejecting *cy pres* of $2.7 million residual in lieu of third distribution to class members) (explicitly adopting *ALI Principles* § 3.07). In *Baby Products*, this Court declined to adopt that rule wholesale, but the approval of the settlement below demonstrates the need for clearer guidance to district courts and a reason to reconcile the existing circuit split. But even under the looser *Baby Products* standard, this settlement does not pass muster.

This settlement presents a scenario even more pernicious than the much-criticized distribution of an oversized residual like in *Baby Products*: class counsel skipped over any attempt to provide benefit to the class and simply spent the settlement money on third parties—though no party presented any evidence in the record that the claims process used in numerous analogous cases without individualized notice could not have been used here. *See* Redish et al., 62 FLA. L. REV. at 657 n.171 (defining this as "*ex ante*" *cy pres*). "This form of *cy pres* stands on the weakest ground because *cy pres* is no longer a

last-resort solution for a problem of claims administration. The concern for compensating victims is ignored (at least unless the indirect benefits of the *cy pres* award flow primarily to the victims)." Jay Tidmarsh, *Cy Pres and the Optimal Class Action*, 82 GEO. WASH. L. REV. 767, 770-71 (2013). Rather, the district court simply held *cy pres* appropriate where it would be infeasible to distribute money to the *entire* class. JA12. This is the wrong standard of law under *Baby Products* (where it was also impossible to distribute settlement money to the entire class), bad public policy, and would create a needless circuit split if affirmed.

Even if *cy pres* rather than class distribution were appropriate, this Court has not expressly reached the issue of whether it is appropriate for beneficiaries to have relationships with the parties or counsel. "A *cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." *ALI Principles* § 3.07 *comment* (b). Google has "significant prior affiliations" with *at least* four of the recipients; lead class counsel is actually chairman of the board of one of the other two recipients. The district court erred as a matter of law both in holding that this was not a "conflict of interest" and that the recipient was appropriate. "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *Baby Products*, 708 F.3d at 178. But a rule permitting class counsel to divert all of a settlement fund to non-profits he is affiliated with creates perverse incentives to ensure that money goes to his favorite cause instead of to his clients.

The district court's decision to ignore obvious conflicts of interest means that class counsel is being doubly compensated at the class's expense: once when class counsel gets to take credit for presenting a check of his clients' money to the organization where he is chairman of the board, and a second time when he collects a commission in attorneys' fees for doing so. This is wrong, and this Court should make that clear.

One more issue: while this Court has indicated that certain *cy-pres* settlements can satisfy Rule 23(e)'s requirements, it has not addressed the issue of whether or when class certification is appropriate when class counsel takes the position that it is impossible to provide material relief to the class. One prerequisite of class certification is that the class representative adequately represent the class. Fed. R. Civ. P. 23(a)(4). If a *cy pres*-only settlement is necessary because it would be too costly to distribute the settlement funds to individual class members, then the class is receiving no marginal benefit for its waiver of claims, and there is no reason to bring the class action except to benefit the attorneys and the class representatives, and class certification is inappropriate. *E.g.*, *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718, 724 (7th Cir. 2016); *cf. Gallego v. Northland Group*, 814 F.3d 123, 129-30 (2d Cir. 2016) (Rule 23(b)(3)); *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013). The district court erroneously failed to even address Frank's objection on this score. JA6.

If the parties insist that distribution to the class is impossible, then the class flunked Rule 23(a)(4) and should not have been certified. But if a claims process is feasible as Frank demonstrated and appellees failed to contest, then a *cy pres*-only

settlement violates class counsel's fiduciary duty, fails to provide any, much less "sufficient direct benefit," and should not have been approved.

## Argument

### I.    As this Court has recognized, *cy pres* is rife with conflicts of interest and requires narrow cabining.

The legal construct of *cy pres* (from the French "*cy pres comme possible*"—"as near as possible") has its origins in trust law as a vehicle to realize the intent of a settlor whose trust cannot be implemented according to its literal terms. *Nachshin,* 663 F.3d at 1038. The classic example of *cy pres* was a 19th-century case where a court repurposed a trust that had been created to abolish slavery in the United States to instead provide charity to poor African-Americans. *Jackson v. Phillips*, 96 Mass. 539 (1867).

Imported to the class action context, *cy pres* is a "misnomer—though one common in the legal literature." *Ira Holtzman, C.P.A. & Assocs. v. Turza*, 728 F.3d 682, 689 (7th Cir. 2013) ("*Turza*") (Easterbrook, J.) (*citing Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 784 (7th Cir. 2004)). Nevertheless, *cy pres* has quite recently become an increasingly popular method of distributing settlement funds to non-class third parties in lieu of class members. Redish, 62 FLA. L. REV. at 653, 661; *Marek*, 134 S.Ct. at 9. "Indeed, in many class actions it is solely the use of *cy pres* that assures distribution of a class settlement or award fund sufficiently large to guarantee substantial attorneys' fees and to make the entire class proceeding seemingly worthwhile." Redish, 62 FLA. L. REV. at 621.

Still, non-compensatory *cy pres* distributions, disfavored among both courts and commentators alike, remain an inferior avenue of last resort. *See, e.g., Baby Products*, 708 F.3d at 173 ("*Cy pres* distributions imperfectly serve that purpose by substituting for that direct compensation an indirect benefit that is at best attenuated and at worse illusory. *Cy pres* distributions also present a potential conflict of interest between class counsel and their clients because the inclusion of a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class."); *BankAmerica,* 775 F.3d at 1063-66; *Pearson,* 772 F.3d at 784; *Turza,* 728 F.3d at 689; *Mirfasihi*, 356 F.3d at 784 ("There is no indirect benefit to the class from the defendant's giving the money to someone else."); *ALI Principles* § 3.07 *comment* (b) (rejecting position that "cy pres remedy is preferable to further distributions to class members"). *See generally* Redish, 62 FLA. L. REV. at 628; Theodore H. Frank, *Cy Pres Settlements*, CLASS ACTION WATCH 1 (March 2008); Frank Statement.

"[A] growing number of scholars and courts have observed, the cy pres doctrine…poses many nascent dangers to the fairness of the distribution process." *Nachshin*, 663 F.3d at 1038 (citing authorities). When *cy pres* distributions are unmoored from class recovery or *ex ante* legislative or judicial standards,

> the selection process may answer to the whims and self interests of the parties, their counsel, or the court. Moreover, the specter of judges and outside entities dealing in the distribution and solicitation of settlement money may create the appearance of impropriety.

*Nachshin*, 663 F.3d at 1039 (citing authorities).

When the charitable distribution is related to the judge, or left entirely to the judge's discretion, the ethical problems and conflicts of interest multiply. Class action settlements require judicial approval: one can readily envision a scenario where a judge looks more favorably upon a settlement that provides money for a judge's preferred charity than one that does not. Even if a judge divorces herself from such considerations, the parties may still believe that it would increase the chances of settlement approval or a fee request to throw some money to a charity associated with a judge. Moreover, charities that know that a judge has discretionary funds to distribute can—and do—lobby judges to choose them, blurring the appropriate role of the judiciary. The "specter of judges and outside entities dealing in the distribution and solicitation of settlement money may create the appearance of impropriety." *Nachshin*, 663 F.3d at 1039 (citing authorities); Liptak, *Doling Out, supra* ("allowing judges to choose how to spend other people's money 'is not a true judicial function and can lead to abuses'" (quoting former federal judge David F. Levi)); *see also id.* (quoting Judge Levi as saying "judges felt that there was something unseemly about this system" where "groups would solicit [judges] for consideration as recipients of *cy pres* awards"); *Turza,* 728 F.3d at 689 (citing cases). In one notorious case, a district court judge *sua sponte* nominated the university at which he lectured as a *cy pres* recipient. Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 U.S.C. L. Rev. 97, 124-25 n. 119 (2014); Parloff, *supra*. In another case, a district court judge approved *cy pres* of more than $1.5 million to his *alma mater*, while expressing a desire to name the scholarship as the "*sic vos non vobis* scholarship" believing "it important than the scholarship have a descriptive and

distinctive name." *Perkins v. Am. Nat'l Ins. Co.*, No. 3:05-cv-100 (CDL), 2012 WL 2839788, at *6 (N.D. Ga. Jul. 10, 2012).

But the parties' unfettered selection of *cy pres* recipients can also cause problems. For example, a defendant could steer distributions to a favored charity with which it already does business, or use the *cy pres* distribution to achieve business ends. *Dennis*, 697 F.3d at 867-68 (ruminating on these issues); *SEC v. Bear, Stearns & Co. Inc.,* 626 F. Supp. 2d 402, 415 (S.D.N.Y. 2009); Parloff, *supra*; Pamela A. MacLean, *Competing for Leftovers*, CALIFORNIA LAWYER 15 (Sept. 2011). In one infamous example, Microsoft sought to donate numerous licenses for Windows software to schools as part of an antitrust class action settlement, essentially using the *cy pres* as a marketing tool that would have frozen out its competitors. *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519 (D. Md. 2002).

Similarly, if a defendant uses a class-action settlement to simply redirect money that it would have given to a charity anyway, then the change in accounting entries serves to simply create the illusion of relief without any real change in the economic relationship of the class or the defendant.

Conversely, if the *cy pres* distribution is related to plaintiffs' counsel, it results in class counsel being double-compensated: the attorney indirectly benefits both from the *cy pres* distribution, and then makes a claim for attorneys' fees based upon the size of the *cy pres. Bear, Stearns,* 626 F. Supp. 2d at 415; *id.* (criticizing *Diamond Chemical Co. v. Akzo Nobel Chemicals BV*, 517 F. Supp. 2d 212 (D.D.C. 2007), where court failed to consider that sole recipient of large *cy pres* was class counsel's *alma mater* law school); Redish, 62 FLA. L. REV. at 661 (*cy pres* awards "can also increase the likelihood and

absolute amount of attorneys' fees awarded without directly, or even indirectly, benefitting the plaintiff"); Liptak, *Doling Out, supra* ("Lawyers and judges have grown used to controlling these pots of money, and they enjoy distributing them to favored charities, alma maters and the like."). In another settlement where class counsel was already scheduled to receive $27 million, *cy pres* was designated to a charity run by class counsel's ex-wife; the conflict was never disclosed to the district court, which approved the settlement. Frank Statement 8 (*citing In re Chase Bank USA NA "Check Loan" Contract Litig.,* No. 09-md-02032 (N.D. Cal.)). Permitting class counsel to collect attorneys' fees based on unmoored *cy pres* awards "threatens to undermine the due process interests of absent class members by disincentivizing the class attorneys in their efforts to assure [classwide] compensation of victims of the defendant's unlawful behavior." Redish, 62 FLA. L. REV. at 666. Likewise, a distribution to a charity affiliated with the named plaintiff can result in a windfall for the class representative and potentially compromise adequacy of representation. *E.g., Nachshin*, 663 F.3d at 1038 (named plaintiff worked for charity that she selected as *cy pres* recipient).

Preferring non-compensatory *cy pres* might be acceptable if the class were a free-floating entity, existing only to permit class counsel to operate as a private attorney general. But that is not how Rule 23 operates; Rule 23 is a complex joinder device that aggregates real individuals with real claims into a class if certain prerequisites are satisfied. *Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (class action is a "species" of joinder). "The plaintiff-class, as an entity, [is] not Lead Counsel's client in this case. Rather, Lead Counsel continue[s] to have responsibilities to each individual member of the class even when negotiating." *Piambino v. Bailey*, 757

F.2d 1112, 1144 (11th Cir. 1985) (internal quotation omitted). Counsel's duty to their client works hand in glove with the proper role of the judiciary—namely, "provid[ing] relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm." *Tyson Foods Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1053 (2016) (Roberts, J., concurring) (internal quotation omitted). *Ex ante cy pres* harms the very underpinnings of Article III.

The American Law Institute has proposed standards in its *Principles of the Law of Aggregate Litigation* to prevent *cy pres* abuse. *ALI Principles* § 3.07. Numerous courts—including this one—have endorsed § 3.07 to a greater or lesser degree. *Nachshin*, 663 F.3d at 1039 n.2; *BankAmerica*, 775 F.3d at 1063-64; *Turza*, 728 F.3d at 689-90; *Klier*, 658 F.3d at 474-75 & nn. 14-16; *In re Lupron Mkt'g and Sales Practices Litig.*, 677 F.3d 21, 32-33 (1st Cir. 2012); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007); *Baby Products*, 708 F.3d at 173 (agreeing in part). This Court should join its sister circuits and endorse these standards explicitly. If so, there is no dispute that this settlement fails to comply with § 3.07, and that the district court's approval should be reversed. But this Court can also reject the settlement approval because the lower court's reasoning eviscerates *Baby Products*.

## II. The district court erred in approving a *cy pres*-only settlement without "sufficient direct benefit" where there was undisputed evidence that a claims process was feasible.

**Standard of Review:** Class certification is reviewed for abuse of discretion. *Carrera v. Bayer Corp.*, 727 F.3d 300, 305 (3d Cir. 2013). "We review a district court's decision to approve a settlement for abuse of discretion." *Baby Products*, 708 F.3d at 175.

"An appellate court may find an abuse of discretion where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.*; *accord Carrera*, 727 F.3d at 305. "To survive appellate review" of a settlement approval, "the district court must show it has explored comprehensively all factors and must give a reasoned response to all non-frivolous objections." *Dennis*, 697 F.3d at 864.

## A.   The district court erred in permitting *cy pres* when it was feasible to make payments to the class.

*Cy pres* is, by definition, "next best." Thus, the *cy pres* "option arises only if it is not possible to put those funds to their very best use: benefitting the class members directly." *Klier*, 658 F.3d at 475; *accord BankAmerica*, 775 F.3d at 1063-66; *Pearson*, 772 F.3d at 784; *Turza,* 728 F.3d at 689; *ALI Principles* § 3.07. This rule follows from the precept that "[t]he settlement-fund proceeds, generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474; *accord ALI Principles* § 3.07 *comment* (b).

This Court's holding in *Baby Products* echoes these principles. "Barring sufficient justification, *cy pres* awards should generally represent a small percentage of total settlement funds." *Baby Products*, 708 F.3d at 174. If *cy pres* is an excessive share of the total relative to direct class recovery, a district court should consider whether to

> urge the parties to implement a settlement structure that attempts to maintain an appropriate balance between payments to the class and *cy pres* awards. For instance, it could condition approval of a settlement on the inclusion of a mechanism for additional payouts to individual class members if the number of claimants turns out to

> be insufficient to deplete a significant portion of the total settlement fund.

*Id.* What's true for a settlement of $3 million payments to the class and $18 million in *cy pres* is even more so for a settlement that pays $0 to the class and $3 million to *cy pres*.

There was no dispute that multiple analogous privacy settlements successfully distributed small sums of money. *Fraley v. Facebook, Inc.*, involved a gigantic class of over a hundred million class members and a settlement fund of less than $0.20/class member. The district court rejected a proposed *cy pres*-only settlement. "Merely pointing to the infeasibility of dividing up the agreed-to $10 million recovery … is insufficient … to justify resort to purely *cy pres* payments." 2012 WL 5838198, at *2 (N.D. Cal. Aug. 17, 2012). Instead, the settling parties were able to distribute millions of dollars by creating a claims process that offered $10 to each claiming class member without coming close to exhausting a $20 million settlement fund. 966 F. Supp. 2d 939 (N.D. Cal. 2013). Indeed, there were so few claims that the parties responded to objections by increasing the payment to under 615,000 total claimants to $15 without any risk of exhausting the settlement fund. *Id.* at 944.

Another district court approved a privacy class-action settlement that distributed a net settlement fund of $5.9 million amongst a 30-million-member class. *In re Carrier iQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366 (N.D. Cal. Aug. 25, 2016). As *Carrier* observed, "if all 30 million people were to make claims, then each person would get approximately 20 cents. However, that is not what actually happens under the settlement." *Id.* at *2. Under the terms of the settlement the funds were distributed *pro rata* to eligible claimants, with a contingent *cy pres* provision if distribution proved

2517    Document: 003112662517    Page: 35    Date Filed: 06/28/2017

"economically unfeasible." *Id.* Ultimately, only 42,577 class members (0.14% of the class) filed claims, resulting in individual payments of more than $100.

Similarly, in *Zepeda v. Paypal*, after a district court rejected a proposed *cy pres*-only settlement as unfair, the settling parties returned to the court with an approvable common fund structure that distributed no less than $1.8 million directly to class members. *Compare* 2014 WL 718509 (N.D. Cal. Feb. 24, 2014), *with* 2015 WL 6746913 (N.D. Cal. Nov. 5, 2015) (granting preliminary approval of amended settlement). Frank's declaration below documented even more examples that demonstrated the feasibility of a claims process for settlements with similar ratios of settlement funds and class sizes. JA183-85.

Settlements like these were able to distribute more than *de minimis* amounts to claiming class members because, as *Carrier* noted, claims rates in claims-made settlements without individualized notice are notoriously low, usually well under 1% for small-dollar amounts. *Id.* at *28 (citing analysis of publication-notice-only settlements where the median claims rate was 0.023%); *accord Pearson*, 772 F.3d at 782 (noting 0.25% claims rate in that case despite payments of over $28/class member); Daniel Fisher, *Odds of a Payoff in Consumer Class Action? Less Than a Straight Flush*, Forbes.com, May 8, 2014 (available at http://www.forbes.com/sites/danielfisher/2014/05/08/odds-of-a-payoff-in-consumer-class-action-less-than-a-straight-flush) (last accessed June 27, 2017). The parties here provided no evidence that a similar *pro rata* claims process paying $5 to $10 per claimant could not have distributed the $3 million or so in the settlement fund after fees and notice to the class here, and did not provide any evidence beyond a bare assertion that a *Fraley/Carrier* claims process would not have been successful in

this case. Rather, class counsel and the court simply noted the irrelevant fact that distribution to 100% of the class would provide *de minimis* amounts—something that was equally true in *Fraley*, *Carrier*, and the numerous other cases Frank identified in his objection that successfully avoided *cy-pres*-only settlements. JA163-64.

Thus, the district court erred as a matter of law in holding that the $5.5 million settlement fund was "non-distributable" because "direct monetary payments to absent class members would be logistically burdensome, impractical, and economically infeasible, resulting (at best) with direct compensation of a *de minimus* [sic] amount." JA11-12. Class counsel submitted no evidence for that assertion, and the district court never addressed the undisputed evidence that similar privacy settlements had been able to use claims processes to provide more than *de minimis* amounts to similarly sizable classes with similarly small ratios of settlement funds to class sizes.[3]

This is reversible error because the district court applied the wrong standard of law. The legal question to be answered has never been, as the district court apparently asked, "Is it feasible to make a direct distribution to every single member of the class without a claims process?" The answer is almost always "No" for any settlement because, if nothing else, it is often administratively impossible to locate every class member. Even in billion-dollar securities settlements where class members have suffered substantial losses, the parties do not know who each and every class member

---

[3] Class counsel protested that if they had used a claims process, Frank would have objected to it. Dkt. 172. The speculative assertion is false; *Baby Products* holds that the use of a reasonable claims process that appropriately prioritizes payments to the class is permissible. 708 F.3d at 174.

is and must rely upon class members to identify themselves and the size of their loss in a claims process.

Even more so in consumer class actions involving small-dollar goods which depend solely upon the affirmations of self-identifying class members to distribute settlement funds that often are much smaller than $5.5 million. After this Court reversed the initial settlement approval in *Baby Products*, on remand the parties reached a settlement increased class recovery from less than $3 million to nearly $18 million. *McDonough v. Toys "R" Us,* 80 F. Supp. 3d 626 (E.D. Pa. 2015). Yet even there, the second settlement's distribution of a $35.5 million settlement fund without *cy pres* left millions of class members with nothing. *Id.* By the district court's standard, it would be permissible to sweep all of these settlements, including *Baby Products*, under the *cy pres* rug rather than make distributions to class members. But the question under *Baby Products* and under *ALI Principles* § 3.07 is whether it is reasonably *possible* to identify class members to pay; if it is, class counsel has a duty to prioritize those payments over payments to third-party non-class members.

Under the correct legal standard, the district court erred in holding that the settlement fund was non-distributable. Indeed, the ratio in this case is not materially different than that in *Pearson*, which rejected a $1.1 million **residual** *cy pres* distribution in a class of over 12 million members, because it was possible to improve the claims process so that more than 0.25% of the class received money. 772 F.3d at 782, 784, 787. (And that indeed happened on remand.) Moreover, the district court had no explanation why the *Fraley* process—also in a settlement with a class "exceed[ing] one hundred million individuals"—could not render this settlement "distributable"; it did

not even mention *Fraley* or *Carrier*, and the parties presented no record evidence contesting the feasibility of the *Fraley* or *Carrier* process in this case. At a minimum, the finding that the fund is "non-distributable" is clearly erroneous and unsupported by any "reasoned response" rebutting Frank's objection and evidence about the ability of claims processes to limit the number of claimants, and must be reversed on that ground. *Dennis*, 697 F.3d at 864.

On appeal, the settling parties may argue again that it would be too difficult to get money to class members. But *Fraley* and *Zepeda* aren't the only case that demonstrates that when courts insist that class members be compensated, settling parties suddenly discover resourcefulness they hadn't previously had. For example, in *Baby Products*, the settling parties unsuccessfully attempted to defend a settlement with a claims process that paid less than $3 million of its $35.5 million settlement fund to the class, where over $15 million would have gone to *cy pres*, arguing as here that it was too difficult to get money to class members without fraud. 708 F.3d at 169-70. On remand, the restructured settlement identified hundreds of thousands of class members who could be issued checks so that there would no longer be a multi-million dollar remainder. *McDonough v. Toys "R" Us,* 80 F. Supp. 3d 626 (E.D. Pa. 2015). The remand of *Pearson* after the Seventh Circuit reversed settlement approval also resulted in a new settlement with millions of dollars more in payments to class members instead of $0.9 million in claims and $1.1 million in *cy pres. Pearson v. Target Corp.*, No. 1:11-cv-07972, Dkt. 288 (N.D. Ill. Aug. 25, 2016); *see also In re Bayer Corp. Combination Aspirin Products Mktg. and Sales Practices Litig.*, No. 09-md-2023, 2013 U.S. Dist. LEXIS 125555 (E.D.N.Y. Sep. 3, 2013) (parties voluntarily found a way to reduce *cy pres* and increase

payments from about $0.5 million to over $5 million after Frank objected on *Baby Products* grounds).

Google might protest that issuing $5 to $10 checks to individual claiming class members would have made this a different settlement, and that it would prefer to pay money to charity than to class members. If so, this just supports Frank's argument that the settlement was structured to create the *illusion* of relief rather than actual relief, and should not be considered more than a $2 million settlement with 100% of the benefit to the attorneys.

This Circuit has never had occasion to review an *ex ante* all-*cy pres* settlement. True: the divided opinion in *Lane v. Facebook* permitted a *cy pres*-only settlement. 696 F.3d 811 (9th Cir. 2012). The same is true for the district-court decision in *In re Google Referrer Litig.*, 87 F. Supp. 3d 1122 (N.D. Cal. 2015), which had largely the usual list of suspects as *cy pres* recipients as other Google settlements including this one. But in *Lane* there was no contention that distribution to the class was feasible; appellants instead challenged the size of the settlement fund and the choice of recipients. *Lane* and *Google Referrer* reached their conclusions without mentioning *Baby Products* or the post-*Lane Fraley* and *Carrier*. Nothing in these decisions is consistent with *Baby Products*, and nothing in *Lane* authorizes parties to bypass feasible distribution to the class to instead benefit their favorite causes.

Class counsel has a "responsibility to seek an award that adequately prioritizes direct benefit to the class." *Baby Products*, 708 F.3d at 178-79. Class counsel cannot choose to favor third-party non-class members over the class—even if those third parties are "worthy" charities (*BankAmerica,* 775 F.3d at 1065, 1067; *Turza,* 728 F.3d

at 689), much less the one where class counsel is chairman of the board. The conflicts of interest that *cy pres* awards can create are easily eliminated by restricting such awards to those narrow circumstances in which any pecuniary relief to the class is infeasible.[4] Class counsel may claim noble intent in wishing that settlement funds go to their *alma mater*, but class counsel should fulfill their good intentions with their own money, rather than that of their clients. Feasible compensation to class members legally trumps *cy pres* payments that do not directly benefit the class.

Class members are supposed to be the "foremost beneficiaries" of class settlements. *Baby Products*, 708 F.3d at 179. But in this settlement, class members receive no more benefits for waiving their damages claims than non-class members or opt-outs do; the marginal benefit is precisely zero, while the attorneys realize a percentage of their lodestar. Class counsel looking out for the best interests of their clients facing this settlement would recommend that every class member opt out. A settlement with no marginal benefit to the class should not be approved under Fed. R. Civ. P. 23(e). *Koby v. ARS National Services, Inc.*, 846 F.3d 1071, 1080 (9th Cir. 2017) ("Because the settlement gave the absent class members nothing of value, they could not fairly or

---

[4] And there should be almost no circumstances in which distribution to a certifiable ascertainable class is entirely infeasible. If nothing else, it is possible to compensate an oversized class with a small settlement fund by random lottery distribution to a percentage of claiming class members. Shay Levie, *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*, 79 GEO. WASH. L. REV. 1065 (2011). As arbitrary as that sounds, it is less arbitrary to distribute $3 million of settlement money to 60,000 or 600,000 class members than to zero class members and to third-party charities that happen to have been affiliated with class counsel and Google.

reasonably be required to give up anything in return."); *In re Walgreen Co. Stockholder Litig.*, 832 F.3d 718 (7th Cir. 2016). Affirming the settlement approval here would make a nullity of *Baby Products,* and also create a circuit split with the Fifth, Seventh, and Eighth Circuits. Neither the settling parties nor the district court provide any reason here to reject what other circuits have done, and neither does *Lane*. Settlement approval must be reversed.

**B.    In the alternative, if it is impossible to create a settlement with "distributable" funds, class certification was an error of law.**

One prerequisite of class certification is adequate representation. Fed. R. Civ. P. 23(a)(4), (g)(4). But where the only purpose of a class action is to benefit class counsel and the class representatives and no incremental relief to the class is possible, such self-serving litigation violates Rule 23(a)(4), and the class should not be certified. *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 751-52 (7th Cir. 2011) (Easterbrook, J.). *Accord Walgreen*, 832 F.3d at 724; *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013); *cf. also Gallego v. Northland Group*, 814 F.3d 123, 129-30 (2d Cir. 2016). In *Gallego*, the district court rejected certification of a class where the costs of litigation "would be disproportionate to the benefit accruing to the class members"—a 16.5-cent payment. 813 F.3d at 129. It "appeared that the intended result of the settlement was 'mass indifference, a few profiteers, and a quick fee to clever lawyers,'" and the district court was correct to refuse to certify. *Id.*

By the district court's conclusion that direct class relief was not possible, the proposed settlement falls into the *Aqua Dots* and *Gallego* category. This inadequacy can be discerned from "the very terms of the settlement." *In re GMC Pick-Up Truck Fuel*

*Tank Prods. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995). This settlement provides at most an indirect and attenuated benefit to the class, justified on the grounds that individual distributions would be *de minimis*, while simultaneously releasing all class members' claims. "[N]on-cash relief … is recognized as a prime indicator of suspect settlements and increases [the] sense that the class's interests were not adequately vindicated." *Id.* at 803.

"No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars." *Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 WL 2215708, at *3 (N.D. Cal. May 29, 2014); *accord Koby*, 846 F.3d at 1080. "The type of class action illustrated by this case—the class action that yields fees for class counsel and nothing for the class—is no better than a racket. It must end. No class action settlement that yields zero benefits for the class should be approved, and a class action that seeks only worthless benefits for the class should be dismissed out of hand." *Walgreen*, 832 F.3d at 724. Class members would be unequivocally better off opting out; yet their fiduciaries intend to bind them to a general release in exchange for no meaningful relief.

A *cy pres* settlement of damages claims where individuals may recover attorneys' fees, in which many of the beneficiaries are already receiving donations from the defendant, is not superior in either fairness or efficiency to other methods of adjudication if class counsel is insufficiently confident enough to litigate the case beyond collecting a fee for themselves and the charity where he is chairman of the board.

The district court simply failed to address the adequacy argument, incorrectly asserting that Frank did not challenge class certification. *Compare* JA6 *with* JA171-72; JA274. This by itself was reversible error requiring remand, as the court had the responsibility to give a "reasoned response" to the objection. *Dennis*, 697 F.3d at 864. *See also In re Cmty. Bank of N. Va & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 319 (3d Cir. 2005) ("With this misunderstanding of the case before it, it is difficult to ascertain how the Court was able to fulfill its duty to scrutinize rigorously the fairness of the settlement.").

But this Court can go further and simply rule in Frank's favor. If the district court is not clearly erroneous that this class action does not bring any hope of "distributable" sums, then the only conceivable beneficiary of the class action are the attorneys and class representatives, and Rules 23(a)(4) and (g)(4) are not met.[5] In that case, the district court erred as a matter of law in certifying the class for the sole purpose of releasing their claims without incremental benefit.

## III.  Even if *cy pres* were appropriate, the defendant's and class counsel's "significant prior affiliation" with the *cy pres* recipients made settlement approval legal error.

**Standard of Review**: This Court has not formally ruled on the standard of review for choosing *cy pres* beneficiaries. To the extent it is part of settlement approval, it is reviewed for abuse of discretion. *Baby Products*, 708 F.3d at 175. "An appellate court

---

[5] Customarily, opt-out classes waiving damages claims are certified under Rule 23(b)(3) rather than (b)(2), as happened here. The settling parties here avoid the "superiority" requirement of (b)(3), but they cannot avoid the adequacy requirements of (a)(4) and (g)(4).

may find an abuse of discretion where the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Id.*

As discussed in the Frank objection and in the statement of the case, Google and class counsel had significant prior affiliations with at least five of the six *cy pres* recipients. The district court rejected that there was any "conflict of interest" and deferred to the wishes of the parties to steer the class's money to previously affiliated non-profits. JA13.

This is wrong as a matter of law. If being chairman of the board of a charity (even on a volunteer basis) doesn't create an incentive to give one's clients' money to that charity if a court permits, what does? "Class members are not indifferent to whether funds are distributed to them or to *cy pres* recipients, and class counsel should not be either." *Baby Products*, 708 F.3d at 178. But a rule that permits class counsel to prefer his own charity goes beyond making class counsel indifferent as between a charity and the class; it makes him affirmatively prefer the charity. Of course an attorney is going to prefer to be lauded by fellow board members for bringing in a six-digit donation to his favorite charity in a ceremony with an oversized check to distributing 300,000 $10 checks to ungrateful class members who probably won't even send a thank-you note. *E.g.,* Chris J. Chasin, *Modernizing Class Action Cy Pres Through Democratic Inputs*, 163 U. PENN. L. REV. 1463, 1484 (2015) ("Many law firms tout their cy pres victories as public service," citing example of self-promotional website of law firm with their *cy pres* recipients); Frank Statement at 5; JA196 (Stanford Center for Internet and Society, *About Us* (2016 version) (thanking several plaintiffs' law firms for their *cy pres* without any acknowledgment to class members who waived rights to create those *cy pres*

funds));[6] *cf. also BankAmerica*, 775 F.3d at 1065 ("flatly reject[ing]" *cy pres* distribution predicated on idea that charity is more worthy recipient than unsympathetic class members).

Similarly, defendants will prefer to make payments to third parties to whom they are already donating money rather than payments to absent class members; donations engender good will, and often merely replace or supplement donations that are already in the pipeline, or which the defendant has a habit of making: in the latter case, then the "relief" to the class is even more illusory, because it merely reflects a shift in accounting entries. Frank Statement at 6. A rule of decision that fails to counter these perverse incentives will result in a disproportionate number of *cy pres*-only settlements.

Other courts disapprove such conflicts of interest when the question is put before them. *Nachshin* rejects the idea of a *cy pres* "selection process [that] answer[s] to the whims and self interests of the parties, their counsel, or the court." 663 F.3d at 1039; *Bear, Stearns*, 626 F. Supp. 2d at 415 (criticizing *cy pres* to charity "funded in part by the defendant"). The correct legal standard is supplied by Section 3.07: a "*cy pres* remedy should not be ordered if the court or any party has any significant prior affiliation with the intended recipient that would raise substantial questions about whether the award was made on the merits." *ALI Principles* § 3.07 *comment (b)*. This settlement flunks that test on its face.

---

[6] Since Frank criticized that webpage in the district court, it has been modified to create a new category for donations received from *cy pres* settlements. http://cyberlaw.stanford.edu/about-us (last accessed June 28, 2017).

"The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1167 (9th Cir. 2013) (internal quotation omitted). "Cy pres distributions present a particular danger" that "incentives favoring pursuit of self-interest rather than the class's interests in fact influenced the outcome of negotiations." *Dennis*, 858 F.3d at 867. This is especially true here where the parties obtained preliminary approval of the settlement without disclosing to the court or the class the significant prior affiliations identified in the Frank objection. Frank cited *Radcliffe* to the district court, JA168-69, but the district court did not give any reasoned response why it was inapplicable, or even mention *Radcliffe*.

The district court relied on *Lane v. Facebook*, JA13, but that case does not support its conclusion. The appellants in *Lane* protested that defendant Facebook would have a role in selecting the *cy pres* recipients to avoid harm to Facebook; they did not identify any recipient that presented an actual conflict of interest, but simply speculated that there might be one that acted against class interests in the future despite the charter of the entity that would distribute *cy pres* funds. 696 F.3d at 821-22. *Lane* held that a recipient need not be "ideal," *id.* at 821, but it did not hold that anything goes once the parties make a choice. This is especially true in the case of a distribution that raises conflicts between *class counsel* and the class. The rationale by which the *Lane* court sanctioned the *cy pres* award—that the terms of the settlement are "the offspring of compromise" that "necessarily reflect the interest of both parties"—has no application to a distribution that unjustifiably favors non-party class counsel. 696 F.3d at 821.

That the parties negotiated a settlement does not mean that they did not negotiate for their own self-interests at the expense of the class; it is the responsibility of the court to investigate for such abuses, because "class action settlements are often quite different from settlements of other types of cases" because of the inherent conflicts of interest between class counsel and the absent class members. *Pearson*, 772 F.3d at 787. It is the district judge's role to "monitor for collusion, individual settlements, buy-offs (where some individuals use the class action device to benefit themselves at the expense of absentees), and other abuses." *GM Trucks*, 55 F.3d at 787. Arm's-length negotiations protect the interests of the class only with respect "to the amount the defendant will pay, not the manner in which that amount is allocated between the class representatives, class counsel, and unnamed class members." *Dry Max Pampers*, 724 F.3d at 717. Thus, a court need not "defer" to the choices in a "freely-negotiated settlement" when they exhibit the conflicts of interest they do here. *Nachshin*, 663 F.3d at 1040. "A proposed *cy pres* distribution must meet these standards regardless of whether the award was fashioned by the settling parties or the trial court." *Id.*

This one does not meet *Nachshin*'s or Section 3.07's standards because of the conflicts of interest. Surely *Lane* does not permit class counsel to direct *cy pres* to a charity run by class counsel's spouse by the mere fact of a negotiated settlement; the conflict of interest would be blatantly self-serving. *Cf. Eubank v. Pella Corp.*, 753 F.3d 718, 728 (7th Cir. 2014). So is the problem of donating to a charity for which class counsel serves as chairman of the board.

The district court also relied on *Google Referrer*, where there were similar conflicts of interest. 87 F. Supp. 3d 1122 (N.D. Cal. 2015). *Google Referrer* is certainly precedent

for approving an abusive *cy pres* settlement, but it should not be persuasive. *Google Referrer* found "potential for a conflict of interest," 87 F. Supp. 3d at 1138, and its approval based on *Lane* is the same legal error committed by the court here. The appeal of that case was argued in March 2017, and is pending. *Gaos v. Google, Inc.*, No. 15-15858 (9th Cir.).

The district court entirely failed to provide a "reasoned response" (*Dennis*, 697 F.3d at 864) to Frank's objection to the beneficiaries' pre-existing relationships with Google, other than to quote *Lane*. JA13. While *Lane* (for better or worse) permits a defendant to take steps to ensure a *cy pres* beneficiary won't act against the defendant's interest, and does not require the beneficiary to be "ideal," nothing in *Lane* obviates *Dennis*'s requirement that *cy pres* donations not be a "paper tiger" sham of "previously budgeted funds." 697 F.3d at 867-68. When the defendant is already a regular contributor to the proposed *cy pres* recipient, there is no demonstrable value added by the defendant's agreement to give money to that institution. *Id.* Google agreed to pay money to institutions that it was in all likelihood going to pay anyway. Such an agreement is of little or no incremental value to the class. *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 286 (7th Cir. 2002) (it is the "*incremental* benefits" that matter, not the "total benefits" (emphasis in original)); *see also In re Hydroxycut Mktg. & Sales Practices Litig.*, No. 09-md-2087 BTM (KSC), 2013 U.S. Dist. LEXIS 165225 (S.D. Cal. Nov. 19, 2013) (rejecting *cy pres* that provided no additional benefit to class members beyond status quo).

Google's "significant prior affiliation with the intended recipient[s] … raise[s] substantial questions" about the merits of the selection process, and is an independent

reason to require reversal of the settlement approval. *ALI Principles* § 3.07 *comment (b)*. *Lane* does not hold otherwise. The error here is especially compounded because Google waived any opportunity to edify the district court about the full extent of its relationship with the beneficiaries, despite Frank's objection about the lack of disclosure. *Cf. In re Southwest Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015) (requiring disclosure to district court of possible conflicts because "Class members were not obliged, on penalty of waiver, to search on their own for a conflict of interest"). "In the absence of the data, the court did not have before it sufficient facts intelligently to approve the settlement offer." *Dry Max Pampers*, 724 F.3d at 719 (cleaned up).

## Conclusion

This Court should reverse this settlement approval as a breach of class counsel's fiduciary duty to prioritize class recovery. The preexisting relationships between the *cy pres* recipients, class counsel, and Google, provide an independent reason to reverse the district court's settlement approval as a matter of law under *Baby Products, ALI Principles* § 3.07, *Dennis*, *Nachshin*, *Radcliffe*, and sound public policy.

If it is truly the case that any distribution to the class is infeasible, then the class should not have been certified, and the Court should reverse on those grounds.

Dated: June 28, 2017              Respectfully submitted,

*/s/ Theodore H. Frank*
Theodore H. Frank (DC Bar No. 450318)
Adam E. Schulman (DC Bar No. 309749)
CENTER FOR CLASS ACTION FAIRNESS
1310 L Street NW, 7th Floor
Washington, DC 20005
Telephone: (202)-331-2263
Email: ted.frank@cei.org

*Attorneys for Objector-Appellant*
*Theodore H. Frank*

## Combined Certifications

**1. Certification of Bar Membership**

I hereby certify under L.A.R. 28.3(d) that I, Theodore H. Frank and Adam E. Schulman are both members in good standing of the bar of the United States Court of Appeals for the Third Circuit.

**2. Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 11,583 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). I hereby certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Garamond font.

**3. Certification of Service**

I hereby certify that on June 28, 2017, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Third Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.

**4. Certification of Identical Compliance of Briefs**

In accordance with L.A.R. 31.1(c), I hereby certify that the electronic and hard copies of this brief in the instant matter contain identical text

**5. Certification of Virus Check**

In accordance with L.A.R. 31.1(c), I hereby certify that a virus check of the electronic PDF version of the brief was performed using McAfee Internet Security software and the PDF file was found to be virus free.

Executed on June 28, 2017.

_/s/ Theodore H. Frank_
Theodore H. Frank