**No. 17-1480**

## IN THE
## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

IN RE: GOOGLE INC. COOKIE PLACEMENT CONSUMER PRIVACY LITIGATION

_____

JOSE M. BERMUDEZ, ET AL.,

*Plaintiffs-Appellees*,

v.

THEODORE H. FRANK,

*Objector-Appellant.*

_____

**On Appeal from the United States District Court
for the District of Delaware, No. 12-md-2358-SLR**

_____

**ANSWERING BRIEF OF PLAINTIFFS-APPELLEES**

_____

James P. Frickleton
BARTIMUS FRICKLETON ROBERTSON &
    GORNY
11150 Overbrook Road, Suite 250
Leawood, KS 66211
(913) 266-2300

Stephen G. Grygiel
SILVERMAN THOMPSON SLUTKIN & WHITE
201 North Charles Street, Suite 2600
Baltimore, MD 21201
(410) 385-2225

Brian R. Strange
STRANGE & BUTLER LLP
12100 Wilshire Boulevard, Suite 1900
Los Angeles, CA 90025
(310) 207-5055

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

COUNTERSTATEMENT OF JURISDICTION .....................................................3

COUNTERSTATEMENT OF THE ISSUES ..........................................................3

COUNTERSTATEMENT OF RELATED CASES ...................................................3

COUNTERSTATEMENT OF THE CASE .............................................................4

      A. After Google's alleged privacy intrusions were exposed, Plaintiffs filed
         suit and engaged in hotly-contested litigation for more than five years....4

      B. Plaintiffs and Google engaged in arm's length negotiations and
         reached a settlement ........................................................................5

      C. The lone objection to the Settlement is overruled and Objector
         appeals .........................................................................................7

COUNTERSTATEMENT OF THE STANDARD OF REVIEW .......................9

SUMMARY OF THE ARGUMENT .....................................................................10

ARGUMENT ...................................................................................................11

I.    The Settlement Is Entitled To A Presumption Of Fairness And
      Easily Satisfies The Requirements Of Rule 23 .........................................11

      A. Class action settlements are entitled to an initial presumption of
         fairness ........................................................................................12

      B. The Settlement easily satisfies the *Girsh* factors and is therefore
         considered "fair, adequate, and reasonable" ....................................13

II.   The Settlement's *Cy Pres* Distributions Benefit Class Members .........15

      A. *Cy pres* settlements benefit class members.....................................15

B. *Cy pres* allocations are proper where direct distributions to class members are administratively impractical or economically irrational......17

    1. Objector applies the incorrect standard of review to *cy pres* settlements..................................................................................17

    2. Case law from around the country resoundingly supports settlements with *cy pres* components..................................................19

C. The Settlement properly employs *cy pres* allocations...................................23

    1. Direct distribution to class members is logistically and economically infeasible........................................................................23

    2. Objector's hypothetical direct distribution theories are unsupported ........................................................................................25

**III.**   **No Conflict Of Interest Undermines The Selected *Cy Pres* Recipients**...................................................................................................33

A. No disqualifying relationships undermine the proposed *cy pres* recipients ...........................................................................................................33

B. Google's previous donations to certain *cy pres* recipients create no conflict and do not diminish the Settlement's value to the class..............36

**CONCLUSION** .....................................................................................................................38

**CERTIFICATE OF COMPLIANCE**...................................................................................40

**CERTIFICATE OF BAR MEMBERSHIP** ......................................................................41

**CERTIFICATE OF SERVICE**..........................................................................................42

# TABLE OF AUTHORITIES

## Cases

*Boyle v. Giral*,
    820 A.2d 561 (D.C. App. 2003) ................................................................ 19, 21

*Caligiuri v. Symantec Corp.*,
    855 F.3d 860 (8th Cir. 2017) ........................................................................31

*Ehrheart v. Verizon Wireless*,
    609 F.3d 590 (3d Cir. 2010) ........................................................................13

*Fraley v. Facebook, Inc.*,
    No. 11-1726 RS, 2012 WL 5838198 (N.D. Cal. Aug. 17, 2012) ........................... 17, 25

*Fraley v. Facebook, Inc.*,
    No. CV-11-01726 RS, 2012 WL 6013427 (N.D. Cal. Dec. 3, 2012) ........................32

*Francisco v. Numismatic Guar. Corp. of Am.*,
    No. 06-61677-CIV, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008) ..................................19

*Gammon v. GC Servs. Ltd. P'ship*,
    162 F.R.D. 313 (N.D. Ill. 1995) ...................................................................19

*Girsh v. Jepsen*,
    521 F.2d 153 (3d Cir. 1975) ..................................................................*passim*

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ................................................................. 15, 25

*Hughes v. Kore of Ind. Enter., Inc.*,
    731 F.3d 672 (7th Cir. 2013) ..................................................................*passim*

*In re Baby Prods. Antitrust Litig.*,
    708 F.3d 163 (3d Cir. 2013) ...................................................................*passim*

*In re BankAmerica Corp. Sec. Litig.*,
    775 F.3d 1060 (8th Cir. 2015) ................................................................. 29, 30

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015) ........................................................................9

*In re Carrier IQ, Inc. Consumer Privacy Litig.*,
   No. 12-md-02330-EMC, 2016 WL 4474366 (N.D. Cal. Aug. 25, 2016) ...................32

*In re EasySaver Rewards Litig.*,
   921 F. Supp. 2d 1040 (S.D. Cal. 2013) ...........................................................................35

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995) ................................................................................... 13, 15

*In re Google Buzz Privacy Litig.*,
   No. 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) ........................... 22, 38

*In re Google Inc. Cookie Placement Consumer Privacy Litig.*,
   806 F.3d 125 (3d Cir. 2015) ...................................................................................3, 4, 5

*In re Google Referrer Header Privacy Litig.*,
   87 F. Supp. 3d 1122 (N.D. Cal. 2015) ......................................................... 16, 33, 36, 38

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 305 (3d Cir. 2008) .............................................................................................9

*In re Nat'l Football League Players Concussion Injury Litig.*,
   821 F.3d 410 (3d Cir. 2016) ...........................................................................................12

*In re Netflix Privacy Litig.*,
   No. 5:11-cv-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013) .............. 19, 22

*In re Polyurethane Foam Antitrust Litig.*,
   168 F. Supp. 3d 985 (N.D. Ohio 2016) ..........................................................................16

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ...................................................................................... 2, 10

*In re Toys "R" Us Antitrust Litig.*,
   191 F.R.D. 347 (E.D.N.Y. 2000) ........................................................... 19, 20, 21, 31

*Klier v. Elf Atochem N. Am., Inc.*,
   658 F.3d 468 (5th Cir. 2011) ................................................................... 16, 25, 26, 27

*Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*,
   26 F.3d 375 (3d Cir. 1994) ..............................................................................................10

*Lane v. Facebook, Inc.*,
   696 F.3d 811 (9th Cir. 2012) ...................................................................*passim*

*Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.*,
   540 F.2d 102 (3d Cir. 1976)..................................................................9, 10, 32

*Matthews v. Freedman*,
   882 F.2d 83 (3d Cir. 1989) ................................................................................2

*Miller v. Ghiradelli Chocolate Co.*,
   No. 12-cv-04936-LB, 2015 WL 758094 (N.D. Cal. Feb. 20, 2015) ....................36, 37

*Mirfasihi v. Fleet Mort. Corp.*,
   356 F.3d 781 (7th Cir. 2004) ...........................................................................27

*New York v. Reebok Int'l Ltd.*,
   96 F.3d 44 (2d Cir. 1996) ..........................................................................3, 19, 20

*Olden v. Gardner*,
   294 F. App'x 210 (6th Cir. 2008) .......................................................................7

*Reade-Alvarez v. Eltman, Eltman & Cooper P.C.*,
   No. CV-04-2195 (CPS), 2006 WL 3681138 (E.D.N.Y. Dec. 11, 2006) ..............19, 21

*Sullivan v. DB Invs., Inc.*,
   667 F.3d 273 (3d Cir. 2011)............................................................................15

*United States v. Joseph*,
   730 F.3d 336 (3d Cir. 2013)..............................................................................9

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005)................................................................................7

*Zepeda v. Paypal, Inc.*,
   No. C 10-2500 SBA, 2015 WL 6746913 (N.D. Cal. Nov. 5, 2015) ..........................32

**Statutes and Rules**

Fed. R. App. P. 30(a)(2) ......................................................................................2

Fed. R. Civ. Proc. 23(e) ...............................................................................10, 12

**Treatises**

3 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 10.14 (4th ed. 2002) ...........................................................................................................8

Elizabeth Cabraser, Esq., *Claims-Made Class Action Settlements*, 99 Judicature, no. 3 (2015) ............................................................................................................24

H. Newberg, Class Actions § 4.36 (1977) ......................................................19

Principles of the Law of Aggregate Litigation § 3.07 (Am. Law Inst. 2010)...................................................................... 8, 29, 30, 34

Shay Levie, *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*, 79 Geo. Wash. L. Rev. 1065 (2011).................................................24

**Miscellaneous**

Allison Grande, *Google to Pay State AGs $17M Over Safari Tracking Claims*, Law360 (Nov. 18, 2013), https://www.law360.com/articles/489533/google-to-pay-state-ags-17m-over-safari-tracking-claims?article_related_content=1 ..................................30

*Attorney General Masto Joins $17 Million Multistate Settlement With Google Regarding Tracking of Consumers*, Nev. Att'y Gen. (Nov. 18, 2013), http://ag.nv.gov/News/PR/2013/Consumer_Protection/ Attorney_General_Masto_Joins_$17_Million_Multistate_Settlement_With_Google _Regarding_Tracking_of_Consumers/ ..........................................................30

*In re Google Inc.*, Assurance of Voluntary Compliance (Nov. 13, 2013), *available at* https://dlbjbjzgnk95t.cloudfront.net/0489000/489533/ Google%20agreement.pdf..............................................................................30

*Transparency*, Google U.S. Pub. Pol'y, https://www.google.com/publicpolicy/transparency.html ................................ 37, 38

# INTRODUCTION

Objector-Appellant Theodore H. Frank ("Objector") does not challenge the overall amount of the Settlement. Rather, along with the usual *ad hominem* criticisms characteristic of attacks on settlements filed by serial objectors, this appeal presents an already settled issue relating to class actions: Whether a class action settlement that results in *cy pres* payments, rather than a direct payment of damages to class members, is a *per se* violation of Rule 23? Legal precedent and common sense both counsel that the answer is "no."

Here, without admitting liability, Defendant Google Inc. ("Google") has agreed to pay millions of dollars to six watchdog organizations that police and protect Internet privacy—the very subject of the surviving claims asserted by the putative class. The settlement fund would be meaningless if divided among the millions of putative class members in this case. The mere mailing of an empty envelope to the identifiable class members would more than exhaust the settlement amount. But giving that money to privacy watchdog organizations, which are "among the preeminent institutions for researching and advocating for online privacy," JA13,[1]

---

[1] "JA" refers to the Joint Appendix. Appellees note that the "Joint Appendix" is not truly "joint" at all. Prior to the filing of Objector-Appellant's Opening Brief, Plaintiffs-Appellees requested that Objector include certain pertinent and relevant documents within the Joint Appendix. Appellant refused. In an effort to conserve judicial resources, Appellees did not raise the issue with this Court but note that this Court has previously found "the failure of [appellant's] counsel . . . to comply with appellees' request for inclusion in the appendix [of designated documents] . . . . to fall far short of the conduct expected of a member of the bar of this court." *Matthews v.*

1

provides the best assurance that the invasions of Internet privacy from which this case arose, and which Google claims have ended, will indeed have ended and will not recur.  Funding of these organizations to police the Internet and protect against future invasions of Internet privacy is the single best remedy under these circumstances, as the District Court correctly found.  JA13.  As the District Court and this Court are required to measure the Settlement against the likelihood of success on the merits, the Court should commend, not condemn, this Settlement.

*Girsh v. Jepsen*, 521 F.2d 153 (3d Cir. 1975), is this Court's leading case on the adequacy of class action settlements, but Objector entirely ignores *Girsh*,[2] under which the fairness, adequacy, and reasonableness of this Settlement are manifest.  *In re Prudential Insurance Co. America Sales Practice Litigation Agent Actions* ("*Prudential*"), 148 F.3d 283 (3d Cir. 1998), re-affirmed *Girsh* and further clarified its reach.  Objector also entirely ignores *Prudential*.[3]

Far from employing a *per se* rule that rejects all settlements involving *cy pres* awards without a direct cash distribution to class members, this Court and numerous other Circuit courts have recently approved *cy pres* distributions.  *See, e.g., In re Baby*

---

*Freedman*, 882 F.2d 83, 86 (3d Cir. 1989).  Notwithstanding Objector's improper attempt to limit the record, Appellees refer the Court to certain docket entries filed in the District Court below that Objector refused to include in the "Joint" Appendix, which the Court may consider and rely on "even though not included in the appendix."  Fed. R. App. P. 30(a)(2).  "Dkt." refers to the docket below, No. 12-md-2358 (D. Del.).

[2] *See* Appellant's Opening Brief on Appeal ("AOB") at iii (Table of Authorities failing to cite *Girsh*).

[3] *See id.* at iv (Table of Authorities failing to cite *Prudential*).

*Prods. Antitrust Litig.* ("*Baby Prods.*"), 708 F.3d 163, 172 (3d Cir. 2013); *Hughes v. Kore of Ind. Enter., Inc.*, 731 F.3d 672, 675–76 (7th Cir. 2013); *Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012); *New York v. Reebok Int'l Ltd.* ("*Reebok Int'l*"), 96 F.3d 44, 49 (2d Cir. 1996). Application of these settled standards for the approval of class action settlements properly led to the District Court's approval of this Settlement and Objector has failed to show the "clear abuse of discretion" required for reversal. For these reasons, the District Court properly granted final approval to the Settlement, and that ruling should be affirmed.

## COUNTERSTATEMENT OF JURISDICTION

Plaintiffs-Appellees ("Plaintiffs") agree that this Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## COUNTERSTATEMENT OF THE ISSUES

1.     Did the District Court clearly abuse its discretion in granting final approval to the class action settlement between Plaintiffs and Google?

2.     Did the District Court clearly abuse its discretion in finding that no conflicts of interest existed with respect to mutually-selected *cy pres* recipients?

## COUNTERSTATEMENT OF RELATED CASES

This case was previously before this Court upon Plaintiffs' appeal of the District Court's order dismissing all claims under Rule 12(b)(6). *In re Google Inc. Cookie Placement Consumer Privacy Litig.* ("*Google Cookie*"), 806 F.3d 125 (3d Cir. 2015).

## COUNTERSTATEMENT OF THE CASE

This case is entirely about Internet privacy.  The facts underlying Plaintiffs'

claims against Google are detailed in this Court's previous opinion in this case.  *Id.* at

130–34.  Plaintiffs provide a brief summary below.

### A. After Google's alleged privacy intrusions were exposed, Plaintiffs filed suit and engaged in hotly-contested litigation for more than five years

In early 2012, numerous individuals, including Plaintiffs, filed complaints in

various federal courts around the country after Google's alleged circumvention of the

default privacy settings of Apple Safari and Microsoft Internet Explorer web browsers

was publicized in the *Wall Street Journal.*  These actions were centralized and

transferred to the District of Delaware for coordinated or consolidated pretrial

proceedings pursuant to 28 U.S.C. § 1407 on June 12, 2012.  Dkt. 1.

On December 19, 2012, Plaintiffs filed a Consolidated Class Action Complaint

("CAC") against Google and other defendants.  Dkt. 46.  In the CAC, Plaintiffs

alleged, on behalf of a nationwide class of consumers, that Google intentionally set

cookies on Plaintiffs' Safari and Internet Explorer web browsers to circumvent the

default cookie-blocking settings of such browsers in violation of various federal and

state laws.  Google denied all allegations of wrongdoing.  The parties propounded and

answered discovery, including initial disclosures (Dkt. 155, 156), requests for

production of documents (Dkt. 155, 158–60), and interrogatories (Dkt. 155, 159).

4

On January 22, 2013, Google filed a motion to dismiss all claims.  Dkt. 56.

After extensive briefing, oral argument was held on July 25, 2013.  On October 9,

2013, the District Court granted the motion to dismiss in its entirety.  Dkt. 122.

Plaintiffs appealed that order to this Court.  Dkt. 125.  On November 10, 2015, this

Court vacated the dismissal of two of Plaintiffs' state law claims, affirmed the

dismissal of Plaintiffs' other claims, and remanded the case to the District Court for

further consideration.  *Google Cookie*, 806 F.3d at 125.

On remand, discovery revealed that Google earned, at most, approximately $4

million from the alleged actions that were the subject of the case.  JA7.  Google "had

already disgorged [any] unjust enrichment by paying more millions of dollars in fines

to the government in settling a Federal Trade Commission investigation into its

actions[.]"  *Id.*

## B. Plaintiffs and Google engaged in arm's length negotiations and reached a settlement

Following remand from this Court, Plaintiffs and Google discussed for several

months the possibility of settling Plaintiffs' claims against Google.  JA134.  On May 9,

2016, Plaintiffs and Google participated in a private all-day mediation before retired

federal Judge Layn R. Phillips.  Before the mediation, the parties exchanged detailed

briefing in response to the mediator's numerous and probing questions regarding the

strengths and weaknesses of Plaintiffs' case, including Plaintiffs' damage theories and

class certification prospects.  The parties then participated in pre-mediation phone

calls with Judge Phillips. During the mediation, with Judge Phillips' assistance, Plaintiffs and Google agreed to the basic terms of the Settlement Agreement. The Settlement was memorialized in a final document executed by all parties as of June 30, 2016. JA127–46.

The Settlement, reached after arm's length negotiations before a highly regarded, neutral former federal judge, provides for (a) assurances of remediation by Google and (b) *cy pres* distributions to six well-respected organizations devoted to the protection of Internet privacy. *Id.* Google agreed to provide class counsel "with assurances that it implemented systems configured to instruct [the] Safari brand web browsers to expire" the offending cookies at issue in this case. JA132 ¶ 5.1. In addition, Google agreed to pay $5.5 million into a settlement fund, to be distributed to designated *cy pres* recipients after payment of costs, notice, attorney's fees, and other administrative fees and expenses. JA130 ¶ 2.30.

Consistent with the Settlement Agreement's terms, Plaintiffs filed a motion for preliminary settlement approval with the District Court. Dkt. 163. On August 31, 2016, the District Court preliminarily approved the Settlement and directed that notice be disseminated to the Settlement Class in accordance with the Settlement Agreement. Dkt. 164. Beginning on September 12, 2016, and continuing until October 24, 2016, notice of the proposed Settlement was disseminated to potential members of the class via targeted online and print advertising.

6

**C. The lone objection to the Settlement is overruled and Objector appeals**

Following more than a month of online and print advertisement, only one objection was received to the Settlement, from Objector Frank.  JA147.  Not one other objection was received, despite the class potentially numbering in the millions, underscoring the Settlement's fairness, adequacy, and reasonableness.  *See also Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (fact that "only 79" out of 11,000 class members objected to class settlement "tends to support a finding that the settlement is fair"); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 118 (2d Cir. 2005) (finding only 18 objections out of 5 million class members is "a small number of objections . . . indicative of the adequacy of the settlement").

Objector Frank's objection made two primary complaints about the Settlement, both of which Plaintiffs responded to in a filing with the District Court on January 4, 2017.[4]  Dkt. 172.  Making no objection to the overall reasonableness of the Settlement's monetary value, Objector complained only about its allocation to *cy pres* recipients because "[*c*]*y pres* distributions do not compensate class members."  JA161; *see also* AOB at 10 ("Frank didn't object to the idea of Google resolving its liability for $5.5 million . . . .").  Objector also took issue with the identity of several of the

---

[4] Objector also challenged class counsel's request for attorney's fees before the District Court.  JA173.  The District Court did reduce the requested attorney's fees, and Objector does not challenge that ruling on appeal.  The attorney's fee issue is therefore not before the Court.

mutually-selected *cy pres* recipients, alleging supposed "conflicts of interest" between both class counsel and Google and the selected recipients.  JA167–69.

The District Court held a final approval hearing on January 11, 2017 and seriously considered each of Objector's arguments.  *See* JA253–94.  In the end, however, the District Court appropriately exercised its discretion and overruled each of Objector's arguments.  JA292.  Regarding the Settlement's distribution to *cy pres* entities devoted to Internet privacy protection, the District Court found, consistent with established precedent,[5] that "the *cy pres* awards at issue pass muster under the prevailing case law" because "the realities of the litigation at bar demonstrate that direct monetary payments to absent class members would be logistically burdensome, impractical, and economically infeasible, resulting (at best) with direct compensation of a *de minimus* amount."  JA12; *see also* PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 cmt. b (AM. LAW INST. 2010) (*cy pres* distribution permissible where "distribution would involve such small amounts that, because of the administrative costs involved, such distribution would not be economically viable"); 3 ALBA CONTE & HERBERT B. NEWBERG, NEWBERG ON CLASS ACTIONS § 10.14, at 511 (4th ed. 2002) ("[T]here may be instances when the class is so numerous and the individual claims so small that no recovery or distributions for past losses are possible as a practical matter.").

---

[5] Objector's brief conjures a non-existent "circuit split" out of what are simply the naturally divergent results of the fact sensitive exercise of judicial discretion in widely varied case settings.  *See* AOB at 15, 16, 32.

The District Court also correctly determined that no conflict of interest existed between any party and any proposed *cy pres* recipient. JA292. Accordingly, the District Court concluded that, "given that [Objector Frank's objection is] the solitary objection . . . to this proposed settlement, and [the court] find[s] no merit to the objection," the Settlement should be finally approved. JA292. Objector thereafter appealed to this Court. JA1.

## COUNTERSTATEMENT OF THE STANDARD OF REVIEW

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the trial court." *Girsh*, 521 F.2d at 156. Consequently, this Court only reviews the decision to certify a class and approve a class-wide settlement for "a clear abuse of discretion." *Id.* at 156 n.7; *see also In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 185 n.1 (3d Cir. 2015). An abuse of discretion only exists "if the district court's decision rests upon a ***clearly erroneous*** finding of fact, an errant conclusion of law or an improper application of law to fact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (emphasis added and internal quotation omitted). "One seeking to establish such an abuse of discretion . . . assumes a heavy burden." *Lindy Bros. Builders, Inc. of Phila. v. Am. Radiator & Standard Sanitary Corp.* ("*Lindy Bros.*"), 540 F.2d 102, 116 (3d Cir. 1976).

The Court does not consider an appellant's arguments if they were not presented to the District Court, *United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013), nor will it consider any arguments not raised in the appellant's opening appeal brief.

9

*See Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.*, 26 F.3d 375, 398 (3d Cir. 1994).

## SUMMARY OF THE ARGUMENT

<u>Settlement Structure</u>.  The Court should affirm the District Court's decision finding that a *cy pres* settlement structure was "fair, reasonable, and adequate" within the meaning of Federal Rule of Civil Procedure 23(e).  Notwithstanding Objector's philosophical disdain for the *cy pres* remedy as a general matter, the only issue on appeal is whether the Settlement complied with Federal Rule of Civil Procedure 23. Addressing that issue requires an analysis of the factors laid out by this Court in *Girsh*, 521 F.2d at 153, as expanded by this Court's decisions in *Prudential*, 148 F.3d at 283, and *Baby Products*, 708 F.3d at 163.  The District Court carefully and properly analyzed each relevant factor required by this Court's precedent and determined that "the record demonstrates that the proposed *cy pres* distributions are appropriately tailored and focused" and, accordingly, "the Settlement is fair, reasonable, and adequate when considered from the perspective of the Settlement Class as a whole."  JA12, 14. Objector's invitation for the Court to engage in the academic exercise of whether *cy pres* distributions are generally acceptable is entirely irrelevant and in no way carries Objector's "heavy burden," *Lindy Bros.*, 540 F.2d at 116, of showing the District Court clearly erred in finding the *cy pres* distribution *in this case* (the only distribution that matters in this appeal) satisfies Rule 23's requirements under this Court's controlling precedents.

10

Conflicts of Interest. The Court should also affirm the District Court's determination that the six *cy pres* recipients were not tainted by any conflict of interest. JA13. Case law is clear that no "conflict of interest" exists where a *cy pres* recipient is jointly selected by the parties and there is a nexus between the goals of the class members and the *cy pres* recipient. That one attorney has a modest, non-controlling affiliation with a *cy pres* recipient is of no import. Similarly, that a defendant has previously donated to a *cy pres* recipient does nothing to show that the *cy pres* recipient was not selected on the merits and in no way diminishes the value or import of additional *cy pres* contributions for the benefit of the class. The Court should affirm the District Court's decision in all respects.

## ARGUMENT

### I.  The Settlement Is Entitled To A Presumption Of Fairness And Easily Satisfies The Requirements Of Rule 23

The bulk of Objector's opening appellate brief focuses on his fixation with the propriety of *cy pres* distributions in class action settlements generally, but does very little to analyze the only inquiry that matters for this appeal—whether the District Court's reasoned determination that the Settlement was "fair, reasonable, and adequate" constitutes a manifest abuse of discretion. Objector eschews that required analysis because it compels the conclusion, which the District Court properly reached, that settlement distributions to *cy pres* entities on behalf of the class in this case are

"fair, reasonable, and adequate" within the meaning of Federal Rule of Civil

Procedure 23(e).

## A. Class action settlements are entitled to an initial presumption of fairness

Third Circuit law calls for the Court to "apply an initial presumption of fairness

in reviewing a class settlement." *In re Nat'l Football League Players Concussion Injury Litig.*

("*In re NFL*"), 821 F.3d 410, 436–37 (3d Cir. 2016).  This is particularly true where, as

here, settlement negotiations "occurred at arms['] length," "the proponents of the

settlement are experienced in similar litigation," and "only a small fraction of the class

objected."  *Id.*  Each of the factors triggering the presumption of fairness are present

here and Objector does not argue otherwise.

Under Federal Rule of Civil Procedure 23(e), a district court may approve a

class action settlement after reasonable notice, a hearing, and a finding that the

settlement is "fair, reasonable, and adequate."  To meet this standard, a settlement

need not be "perfect."  *In re NFL*, 821 F.3d at 448; *see also Lane*, 696 F.3d at 819

("[T]he question whether a settlement is fundamentally fair within the meaning of

Rule 23(e) is different from the question whether the settlement is perfect in the

estimation of the reviewing court.").  Moreover, there is a "strong presumption in

favor of voluntary settlement agreements" that is "especially strong in 'class actions

and other complex cases where substantial judicial resources can be conserved by

avoiding formal litigation.'"  *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594–95 (3d Cir.

12

2010) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.* ("*Gen. Motors*"), 55 F.3d 768, 784 (3d Cir. 1995)).

### B. The Settlement easily satisfies the *Girsh* factors and is therefore considered "fair, adequate, and reasonable"

This Court long ago outlined the factors that district courts must consider when determining whether a proposed class action settlement is "fair, adequate, and reasonable," in what are now commonly referred to as the *Girsh* factors. *Girsh*, 521 F.2d at 157. Tellingly, Objector did not even cite to *Girsh* in his opening brief. *See* AOB at iii (Table of Authorities failing to cite *Girsh*). Presumably that glaring oversight is intentional, because application of the *Girsh* test shows that the Settlement, including its *cy pres* distributions, is fair, adequate, and reasonable. Instead, Objector's appeal focuses on his *individual* preferred distribution method and not on whether the Settlement *for the class as a whole* is fair, reasonable, and adequate.

If there was any doubt, the nine *Girsh* factors include:

(1)   The complexity, expense, and likely duration of the litigation;
(2)   The reaction of the class to the settlement;
(3)   The stage of the proceedings and the amount of discovery completed;
(4)   The risks of establishing liability;
(5)   The risks of establishing damages;
(6)   The risks of maintaining the class action through the trial;
(7)   The ability of the defendants to withstand a greater judgment;
(8)   The range of reasonableness of the settlement fund in light of the best possible recovery; [and]
(9)   The range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

13

*Girsh*, 521 F.2d at 157 (quotation and ellipses omitted; capitalizations added).  The District Court engaged in a thorough analysis of all nine *Girsh* factors and determined that, on the whole, the Settlement satisfied them and was accordingly "fair, adequate, and reasonable." JA9–11.  Indeed, the District Court correctly determined that "the thrust of the sole objection is not directed to the *Girsh* factors, and the record adequately establishes that the applicable *Girsh* factors have been satisfied." JA9.

In addition to the *Girsh* factors, this Court expanded the analysis of class action settlements in requiring a "thorough" and "practical" analysis of settlement terms vis a vis "the degree of direct benefit provided to the class" verses any *cy pres* awards. JA11 (citing *Baby Prods.*, 708 F.3d at 174).  Again, the District Court considered this Court's precedent carefully and, from the informed vantage point of "[h]aving overseen this litigation from the time it was instituted," the "court conclude[d] that the realities of the litigation at bar demonstrate that direct monetary payments to absent class members would be logistically burdensome, impractical, and economically infeasible, resulting (at best) with direct compensation of a *de minimus* amount." JA12. Accordingly, the District Court found that the "facts of record, then, are clearly distinguishable from those addressed in *In re Baby Products Antitrust Litigation*. . . ." JA12 (citing *Baby Prods.*, 708 F.3d at 163).

The Settlement is entitled to a presumption of fairness.  The Settlement and the benefits it confers on the class more than satisfy the *Girsh* and *Baby Products* tests.

Accordingly, the District Court cannot be found to have clearly abused its discretion in approving the Settlement, and this Court should affirm that decision.

## II. The Settlement's *Cy Pres* Distributions Benefit Class Members

Objector's attack on the Settlement's allocation to *cy pres* recipients entirely ignores the reasoning and rationale for a *cy pres* settlement distribution in the first place. *See Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 325 n.58 (3d Cir. 2011) ("[W]e must remain cognizant that our intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the [settlement] agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." (quotation omitted)); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) (possibility that "settlement could have been better . . . does not mean the settlement presented was not fair, reasonable or adequate," because "[s]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"); *Gen. Motors*, 55 F.3d at 806 ("[S]ettlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.").

### A. *Cy pres* settlements benefit class members

Objector's fundamental complaint is that the Settlement provides "no marginal benefit to the class" because "*cy pres* payments . . . do not directly benefit the class." AOB at 31. Leaving aside the fact that *cy pres* distributions do indirectly compensate

class members, numerous courts have determined—often despite objections from this Objector and others—that appropriately tailored and focused *cy pres* allocations are effective and beneficial, particularly where direct distributions to class members are logistically burdensome, impractical, or economically infeasible. *See, e.g.*, *Lane*, 696 F.3d at 819 ("[C]*y pres* . . . is a settlement structure wherein class members receive an indirect benefit . . . ."); *Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 475 (5th Cir. 2011) (where direct distribution not "logistically feasible" or "economically viable," *cy pres* allocation "puts the funds to their next-best use by providing an indirect benefit to the class"); *In re Polyurethane Foam Antitrust Litig.*, 168 F. Supp. 3d 985, 1005 (N.D. Ohio 2016) ("A *cy pres* distribution puts settlement funds to their next-best use by providing an indirect benefit to the class."); *see also In re Google Referrer Header Privacy Litig.* ("*Google Referrer*"), 87 F. Supp. 3d 1122, 1128 (N.D. Cal. 2015) (rejecting Objector Frank's objections to *cy pres* settlement and finding settlement consonant with "the primary objective of the class action procedure—to enable litigation where it otherwise would be economically infeasible").

Objector also ignores the teaching of this Court's decision in *Baby Products*, 708 F.3d at 163. Giving an appropriately wide berth to the District Court's discretion in approving *cy pres* settlements, the *Baby Products* court emphasized that such cases are not confined solely to those in which direct distribution is economically infeasible: "Although we agree with the ALI that *cy pres* distributions are most appropriate where further individual distributions are economically infeasible, we decline to hold that *cy*

16

*pres* distributions are only appropriate in this context." *Id.* at 173.  Continuing, the

court rooted that broad endorsement of *cy pres* allocations in black letter settlement

approval law: "The role of a district judge is not to determine whether the settlement

is the fairest possible resolution," but only "whether the compromises reflected in the

settlement—including those terms relating to the allocation of settlement funds—are

fair, reasonable, and adequate when considered from the perspective of the class as a

whole." *Id.* at 174.

> **B.   *Cy pres* allocations are proper where direct distributions to class members are administratively impractical or economically irrational**

> **1.   Objector applies the incorrect standard of review to *cy pres* settlements**

Objector misconstrues the relevant standard used to assess the propriety of a *cy*

*pres* award.  Objector incorrectly claims that the "district court erred in approving a *cy*

*pres*-only settlement without 'sufficient direct benefit' where there was [allegedly]

undisputed evidence that a claims process was feasible." AOB at 23.  For support,

Objector leans heavily on *Fraley v. Facebook, Inc.*, No. 11-1726 RS, 2012 WL 5838198

(N.D. Cal. Aug. 17, 2012), for the proposition that a settlement distribution to *cy pres*

recipients is improper.  AOB at 25.

Apart from ignoring the contrary language from this Court's *Baby Products*

decision, Objector glosses over the fact that just one month after the district court's

decision in *Fraley*, the Ninth Circuit affirmed final approval of another settlement that

provided only prospective relief and *cy pres* awards in *Lane*, 696 F.3d at 816. This later

Ninth Circuit decision trumps the prior district court opinion in *Fraley*. Under *Lane*,

the proper inquiry is whether the *cy pres* awards are "the next best distribution." *Id.* at

820. A *cy pres* distribution is the "next best" where it "bears a substantial nexus to the

interests of the class members" and takes into consideration "the nature of the

plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the

silent class members." *Id.* at 821 (internal quotations omitted).

Here, the *cy pres* distributions satisfy that standard, just as the District Court

determined. *See* JA12–13 ("With respect to whether the proposed *cy pres* distributions

bear a direct and substantial nexus to the interests of absent class members, the record

demonstrates that the proposed *cy pres* distributions are appropriately tailored and

focused."). This case is about Google's alleged circumvention of Internet browser

privacy settings. Each proposed *cy pres* recipient must agree to "devote the funds to

promote public awareness and education, and/or to support research, development,

and initiatives, related to the security and/or privacy of Internet browsers." JA12–13,

133. The proposed *cy pres* recipients are among the preeminent institutions for

researching and advocating for online privacy and Objector does not argue otherwise.

In light of the indisputable fact that the administrative cost of sending out what would

be very small payments to millions of class members would exceed the total monetary

benefit obtained by the class, the proposed *cy pres* distributions are the next best

distribution. *See Lane*, 696 F.3d at 821 (*cy pres* awards bore a "direct and substantial

18

nexus to the interests of absent class members" where *cy pres* money promoted causes of online privacy and security).

### 2. Case law from around the country resoundingly supports settlements with *cy pres* components

Numerous other circuit and district courts nationwide have similarly approved class action settlements that included solely monetary awards to *cy pres* recipients and no corresponding injunctive relief or award to absent class members. *See Reebok Int'l*, 96 F.3d at 44; *Hughes*, 731 F.3d at 672; *Lane*, 696 F.3d at 811; *Boyle v. Giral*, 820 A.2d 561 (D.C. App. 2003).[6] By contrast, Objector has cited no cases on which he can rely to support the opposite argument. The cases approving *cy pres* awards support the payment of settlement proceeds to *cy pres* recipients for the benefit of the class where, as here, the overall settlement amount is small compared to the size of the class such that no feasible way exists to distribute settlement proceeds to class members in amounts that are not either *de minimus* or completely consumed by the costs of distribution.

---

[6] Numerous district courts around the country have also approved *cy pres* class action settlements like the Settlement in this case. *See, e.g.*, *In re Netflix Privacy Litig.*, No. 5:11-cv-00379 EJD, 2013 WL 1120801 (N.D. Cal. Mar. 18, 2013); *Francisco v. Numismatic Guar. Corp. of Am.*, No. 06-61677-CIV, 2008 WL 649124 (S.D. Fla. Jan. 31, 2008); *Reade-Alvarez v. Eltman, Eltman & Cooper P.C.*, No. CV-04-2195 (CPS), 2006 WL 3681138 (E.D.N.Y. Dec. 11, 2006); *In re Toys "R" Us Antitrust Litig.* ("*Toys "R" Us*"), 191 F.R.D. 347 (E.D.N.Y. 2000); *Gammon v. GC Servs. Ltd. P'ship*, 162 F.R.D. 313, 321 (N.D. Ill. 1995) (certifying class and explaining that "[d]isgorgement of illegal gains from wrongdoers, together with . . . application of the recovery for the benefit of class members under *cy pres* doctrines, would fulfill the deterrence objectives of class actions" (ellipses in original) (quoting H. Newberg, Class Actions § 4.36 (1977))).

*Reebok International*, 96 F.3d at 46, is particularly instructive. There, the Second Circuit upheld a settlement agreement that distributed $8 million on a pro-rata basis to states "to be used either by the States or by designated not-for-profit organizations to support recreational activities." *Id.* The court found the *cy pres* distribution to be "fair, reasonable, and adequate" because, among other things, "[t]he impracticality of attempting to distribute the settlement proceeds" of "less than four dollars" to plaintiffs totaling just over 1.7 million was "obvious" and "such distribution would be consumed in the costs of its own administration." *Id.* at 49 (quotation omitted). The court further explained that "[b]ecause of the unlikelihood of there being any significant 'net monetary relief' for individual claimants if an attempt were made to distribute the settlement proceeds among them, the district court did not err in approving distribution to the States and non-profit entities to be used in providing and improving athletic equipment and facilities and related uses, areas in which Reebok equipment plays a substantial role." *Id.* In dismissing the appeal, the Second Circuit opined: "To sum up, the unlikelihood of there being any individual net recovery gives cause to wonder why appellants have made this almost frivolous effort to seek reversal." *Id.*

In *Toys "R" Us*, 191 F.R.D. at 349, the district court applied *Reebok International* to a consumer class action, approving settlements that did not provide any individual compensation to consumers harmed by defendants' alleged anticompetitive conduct, and instead provided $57 million in *cy pres* distributions "in toys and cash." The court

noted that "[t]he net monetary relief for any individual claimant would have been limited" and cited the Second Circuit's concern in *Reebok International* about individual distribution, finding such distribution "would be consumed in the costs of its own administration." *Id.* at 354.[7]

Additionally, in *Boyle*, 820 A.2d at 567 (quotation and brackets omitted), the District of Columbia Court of Appeals upheld approval of a class action settlement where, as here, "[t]he difficulty and cost of identifying and paying individual claimants would likely use up the fund provided for the consumer class settlement." The court noted that, "[*cy pres*] distributions, including the entire amount of the consumer settlement fund rather than just the residue, are being used or advocated increasingly where direct distribution of settlement funds to individual class members is impractical; and where important consumer goals, such as disgorgement of ill-gotten gains . . . can be achieved." *Id.* at 569. Accordingly, just like in this case, the court found that "infeasibility of direct distribution to individual members of the consumer class was ample justification for placing the money in a fund available for activities in the public interest." *Id.* at 570 (brackets omitted).

And in *Lane*, 696 F.3d at 817, the Ninth Circuit upheld a *cy pres* settlement totaling $9.5 million, with $6.5 million in funds dedicated to creating a new charity

---

[7] Another case from within the Second Circuit is *Reade-Alvarez*, 2006 WL 3681138, at *4 (approving class settlement under the FDCPA for 40,000 member class that called for (1) defendant's promise to abide by federal laws; (2) incentive payments to class representatives; (3) $15,000 in *cy pres* payments to a legal aid society; and (4) $50,000 in attorney's fees).

organization called the Digital Trust Foundation and the remaining $3 million

allocated to attorney's fees, administrative costs, and incentive payments to class

representatives. The Ninth Circuit explained that *cy pres* payments are appropriate

where, as in this case, "the proof of individual claims would be burdensome or

distribution of damages costly." *Id.* at 819. The court explained that a *cy pres*-only

settlement would not be reasonable unless the *cy pres* remedy "accounts for the nature

of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of

the silent class members." *Id.* at 819–20.[8]

Most recently, in *Hughes*, 731 F.3d at 675, the Seventh Circuit approved a *cy pres*

distribution where individual class members' damages were less than $4.00 each. The

court explained that "the *cy pres* remedy may be the only one that makes sense" where

"the award of damages to the class members would have no greater deterrent effect

than the *cy pres* remedy, would do less for consumer protection than if the money is

given to a consumer protection charity, and would impose a significant administrative

expense that handing the [settlement amount] over to a single institution would

avoid." *Id.* at 678.

---

[8] Several other cases from within the Ninth Circuit similarly uphold *cy pres* settlements in circumstances like those found in this case. *See In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (approving $9 million *cy pres* settlement where, if distributed, the amount per class member "would likely prove to be nullified by distribution costs"); *In re Google Buzz Privacy Litig.* ("*Google Buzz*"), No. 10-00672 JW, 2011 WL 7460099 (N.D. Cal. June 2, 2011) (approving $6 million *cy pres* distribution in case involving all users of Gmail presented with the opportunity to use a short-lived Google product called Google Buzz).

As demonstrated above, courts around the country routinely determine that *cy pres*-only settlement funds more than meet Rule 23's requirement that settlements be "fair, adequate, and reasonable." Here, the District Court joined those many courts and similarly determined that the "Settlement is fair, reasonable, and adequate when considered from the perspective of the Settlement Class as a whole." JA13. Far from clearly erroneous, this decision finally approving the Settlement should be affirmed.

## C. The Settlement properly employs *cy pres* allocations

### 1. Direct distribution to class members is logistically and economically infeasible

Objector recognizes, as he must, that *cy pres* allocations are proper where direct distribution to class members would involve unduly burdensome logistics or *de minimus* payments. AOB at 16. Instead, Objector argues that the Settlement here is, in fact, feasibly distributable and in meaningful amounts. *Id.* at 24–32. Objector suggests a "claims made" or "lottery" distribution plan would be preferable to *cy pres* distributions for the benefit of the entire class. *Id.* at 31. But both of Objector's distribution theories fail to account for the specifics of the instant case. Both theories are abstract generalities that, in reality, do not come close to addressing the Internet privacy concerns of all class members in this case.

Objector contends that a "claims made" and/or "lottery" distribution process would be feasible and preferable to *cy pres* distributions.[9]  *Id.*  As to his "lottery" proposal, Objector offers only a single law review article in support.  Objector provides not even a hint as to how to identify class members for "random" sampling, let alone what criteria would be used to select a statistically valid sample.  *Id.* at 31 n.4 (citing Shay Levie, *Reverse Sampling: Holding Lotteries to Allocate the Proceeds of Small-Claims Class Actions*, 79 GEO. WASH. L. REV. 1065 (2011)).  Far from resolving the case, this proposal would likely produce more litigation and competing arguments over sample size, survey questions used to select class members, the proper characteristics of a valid sample, and so on.  Perhaps most tellingly, Objector cites to no case actually implementing his theoretical "lottery" distribution method and this Court should decline to entertain Objector's speculative and unproven theories.

Nor would Objector's "claims-made process" work for this case.  In support of his "claims made" distribution suggestion, Objector returns to *Fraley*, wherein the court rejected a *cy pres* distribution absent proof of the feasibility of direct distributions.  But *Fraley* acknowledged that "*cy pres* payments may be appropriate

---

[9] Objector's citations purporting to demonstrate the feasibility of a "claims made" distribution are flawed.  AOB at 31.  Meaningful data resulting in statistically valid conclusions regarding claims made distributions is extremely difficult to find.  *See, e.g.*, Elizabeth Cabraser, Esq., *Claims-Made Class Action Settlements*, 99 JUDICATURE, no. 3 (2015) ("There is no reliable, comprehensive data on claims rates and claims numbers in class-action settlements . . . .  This data is simply unknown, except to those directly involved in the action . . . .  It has been my experience that claims rates vary widely and are difficult to predict.").

where the proof of individual claims would be burdensome or distribution of damages costly." *Fraley*, 2012 WL 5835366, at *1 (internal quotation omitted) ("[T]here is no dispute that it would be impractical to the point of meaninglessness to attempt to distribute the proposed $10 million in monetary relief among the members of a class that may include upwards of 70 million individuals.").

At bottom, Objector's speculation about the method of allocation for the Settlement (not its size or reasonableness) amount to just that, speculation. Objector ignores that, other than his Objection, ***not one*** member of the class objected to the Settlement. This Court should decline to allow a single Objector to substitute his speculative distribution ideas for the reasoned experience of class counsel and the District Court below. *See Hanlon*, 150 F.3d at 1027 (possibility "that the settlement could have been better . . . does not mean the settlement presented was not fair, reasonable or adequate"). The District Court's decision should be affirmed.

### 2. Objector's hypothetical direct distribution theories are unsupported

Objector cites a number of cases, none of which actually support his direct distribution theories in ***this*** case. Rather, Objector's arguments amount to academic arguments regarding *cy pres* distributions in the abstract, which, whatever their theoretical appeal, have no practical application to the facts at hand.

Objector relies primarily on *Klier*, 658 F.3d at 468, for his assertion that the "*cy pres* option arises only if it is not possible to put those funds to their very best use:

benefitting the class members directly." AOB at 24 (quotation omitted). But *Klier* is completely distinguishable. In *Klier*, the Fifth Circuit was reviewing the district court's rejection of "the settlement administrator's request to distribute the unused [residue of one subclass's settlement] to another subclass of persons suffering serious injuries." *Klier*, 658 F.3d at 471. The case arose out of thousands of claims for personal injury resulting from toxic emissions at an industrial plant. The initial settlement created three subclasses: one class of persons who suffered demonstrable serious physical injuries; another subclass of those who were not required to demonstrate physical injury but lived close to the plant; and a third subclass of property owners who were compensated for property damage and diminution in property value. *Id.* at 472.

When $830,000 of the settlement reserved for the subclass consisting of individuals with less serious or as yet non-existent injuries went unclaimed, the settlement administrator requested that the district court transfer the funds for the benefit of the class that had suffered serious injuries. The district court refused the request and instead "ordered distribution of the remaining funds to three of the charities proposed by the defendant[.]" *Id.* at 473. Thus, rather than a case about approval of *cy pres* after arm's length negotiations between parties to litigation, as is the case here, *Klier* instead dealt with a judicially-imposed *cy pres* award and refusal to distribute settlement funds to a subclass of plaintiffs who had suffered severe injury. That sub-class was known and it was easy to redirect the unused funds for the benefit of those class members. The Fifth Circuit unremarkably held that "[t]he district court

26

abused its discretion by ordering a *cy pres* distribution instead of distributing the unused medical-monitoring funds to the members of Subclass A." *Id.* at 480.

Likewise, Objector's citation to *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004), is not relevant to his proposition that, "[t]here is no indirect benefit to the class from the defendant's giving the money to someone else." AOB at 19. *Mirfasihi* was not a *cy pres* case. It did not, as the Settlement in this case does, propose distribution of unjust enrichment damages to organizations dedicated to fighting the alleged wrongdoing at the heart of the case. Instead, the *Mirfasihi* settlement transferred unjust enrichment damages from one class to another. *See Mirfasihi*, 356 F.3d at 783 (explaining proposed settlement "transferred the profits to the telemarketing class").

Here, the *cy pres* remedy is the product of arm's length negotiation between experienced counsel before an experienced, neutral mediator. Unlike *Klier*, it is not a judicially-imposed *cy pres* award. And, unlike *Mirfasihi*, the *cy pres* remedy in this case does not take the damages existing for one class and "transfer" them to another class. Rather, in the face of the economic realities that prohibited payment to individual class members, as the District Court recognized, JA9, the *cy pres* remedy distributes unjust enrichment proceeds to a group of established and respected non-profit entities with purposes directly related to the underlying claims of all class members: Internet privacy protection for consumers. The District Court carefully evaluated the

27

options available in light of the objection made and entered an appropriate order approving the Settlement.

As Judge Posner explained in *Hughes*, in some cases "the *cy pres* remedy may be the only one that makes sense," such as where "the award of damages to class members would have no greater deterrent effect than the *cy pres* remedy, would do less for consumer protection than if the money is given to a consumer protection charity, and would impose a significant administrative expense that handing the [settlement amount] over to a single institution would avoid." *Hughes*, 731 F.3d at 678. Further, where the per claimant amount was less than $4.00 each, Judge Posner explained that "the amount of damages that each class member [could] expect to recover is probably too small even to warrant the bother, slight as it may be, of submitting a proof of claim in the class action proceeding." *Id.* at 675. And "[s]ince distribution of damages to the class members would provide no meaningful relief, the best solution may be . . . a '*cy pres*' decree." *Id.* Judge Posner further explained that the benefits of *cy pres* to class members in small dollar cases may be greater than direct payment:

> Payment of $10,000 to a charity whose mission coincided with, or at least overlapped, the interest of the class (such as a foundation concerned with consumer protection) would amplify the effect of the modest damages in protecting consumers. A foundation that receives $10,000 can use the money to do something to minimize violations of the Electronic Funds Transfer Act; as a practical matter, class members each given $3.57 cannot.

*Id.* at 676.

What is true for $10,000 *cy pres* awards certainly is true for this Settlement involving millions of dollars in *cy pres* distributions and millions of potential class members. The "preeminent institutions for researching and advocating for online privacy," designated as *cy pres* recipients here, may very well use the funds to better protect online security and privacy than vanishingly small distributions—if any could even be made—to individual class members. JA13.

Finally, Objector argues throughout his brief that *ALI Principles* § 3.07 supports his theoretical direct distribution hypothesis in all cases involving *cy pres* distributions. AOB at 9, 12. Section 3.07 provides:

> A court may approve a settlement that proposes a *cy pres* remedy. . . . The court must apply the following criteria in determining whether a *cy pres* award is appropriate:
>
> (a)    If individual class members can be identified through reasonable effort, **and the distributions are sufficiently large to make individual distributions economically viable**, settlement proceeds should be distributed directly to individual class members. . . .
>
> (c)    If the court finds that individual distributions are not viable . . . , the settlement may utilize a *cy pres* approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class.

*In re BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060, 1063–64 (8th Cir. 2015) (quoting PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 (AM. LAW INST. 2010) (emphasis added)).

Under *ALI Principles* section 3.07, Objector's analysis is contingent upon the existence of distributions that "are sufficiently large to make individual distributions economically viable." *Id.* In that vein, Amicus State Attorneys General[10] argue that class members here could receive awards sufficiently large to warrant distribution.[11] *See* Amended Brief of Thirteen State Attorneys General as Amici Curiae at 9. Amici cite cases supporting a low claims rate between 0.25 and 2.0%, and say "a feasibility standard is satisfied where *cy pres* is restricted so it could only occur when settlement funds were insufficient to provide 'at least $2 to each approved claimant.'" *Id.* at 11

---

[10] Notably, despite receiving notice of the Settlement under the Class Action Fairness Act following its preliminary approval by the District Court, the Amicus State Attorneys General did not object to the Settlement in that venue. Thus, the District Court had no opportunity to address the Amicus State Attorneys General's concerns and they should not now be heard to complain for the first time on appeal.

[11] The Amicus State Attorneys General's position against *cy pres* distributions in this case is perplexing given that ten of the thirteen states signing the amicus brief (all except Alaska, Louisiana, and Missouri) accepted part of a $17 million settlement with Google for the very same acts alleged by Plaintiffs here. *See* Allison Grande, *Google to Pay State AGs $17M Over Safari Tracking Claims*, LAW360 (Nov. 18, 2013), https://www.law360.com/articles/489533/google-to-pay-state-ags-17m-over-safari-tracking-claims?article_related_content=1. The $17 million settlement was paid directly to the States, not to affected consumers, essentially making it a *cy pres* settlement in all but name. *See In re Google Inc.*, Assurance of Voluntary Compliance ¶ 14 (Nov. 13, 2013), *available at* https://dlbjbjzgnk95t.cloudfront.net/0489000/489533/Google%20agreement.pdf ("Google shall pay Seventeen Million Dollars . . . directly to each of the Attorneys General . . . . Said payment shall be used . . . at the sole discretion of the Attorneys General."); *see also Attorney General Masto Joins $17 Million Multistate Settlement With Google Regarding Tracking of Consumers*, NEV. ATT'Y GEN. (Nov. 18, 2013), http://ag.nv.gov/News/PR/2013/Consumer_Protection/Attorney_General_Masto_Joins_$17_Million_Multistate_Settlement_With_Google_Regarding_Tracking_of_Consumers/ ("Nevada's share of the settlement is $268,443, which will go to the state's general fund."). It is also notable that none of the thirteen State Attorneys General signing the amicus brief are from states within the Third Circuit.

(citing *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 867 (8th Cir. 2017)).  Judge Posner

disagrees, stating that in cases where the compensation to claimants is less than four

dollars each, "the *cy pres* remedy may be the only one that makes sense." *Hughes*, 731

F.3d at 675.  That is exactly the case here, where the unchallenged $5.5 million

settlement amount, to be distributed among tens of millions of American Internet

users, less fees and costs for notice and distribution, would equate to *de minimus*

amounts.[12]  *See also* JA291 (The Court: "[H]aving overseen this litigation from the time

it was instituted, I believe this has always been a case in which the facts preclude

direct individual compensation.").

Further, the District Court heard no evidence that anything other than the *cy*

*pres* settlement terms made sense economically.  JA260 (Plaintiffs' counsel: "I don't

think there's any dispute that this case involves millions of users of the Safari browser

[and] the Internet Explore[r] [browsers] . . . .");  JA291.  Objector's contrary argument

was all "tell" and no "show."  Common sense, in light of the millions of affected class

members, shows the practical impossibility of any such proffer.  Rather than submit

actual evidence relating to the costs of notice and distribution under the facts of *this*

*case*, Objector merely provided the District Court with examples of notice and

distribution that occurred in *different cases with different facts*.  JA184–85.  The three cases

---

[12] Realistic estimates place the cost of processing and mailing a check to a single claimant at about $1.00 per check.  As in *Reebok International* and *Toys "R" Us*, the direct distribution "would be consumed in the costs of its own administration." *Toys "R" Us*, 191 F.R.D. at 354.

cited by Objector and amici as "proof" that direct distribution in this case would be economically feasible are inapt comparisons.[13]  And the District Court carefully considered the claims made by Objector, evaluated the requirements of the law, and rationally concluded that the Settlement should be approved.

Having failed to provide any case-specific facts in the District Court to show the feasibility of direct monetary distributions, Objector now asks this Court, as he asked the District Court, to extrapolate from facts in different cases that a different settlement distribution regime in this case might have been economically feasible. Having failed to produce any evidence demonstrating the logistical and economic feasibility of such a distribution, Objector cannot carry the "heavy burden," *Lindy Bros.*, 540 F.2d at 116, required to show a clear abuse of discretion.   Accordingly, this Court should affirm the decision below.

---

[13] All three cases cited by Objector and amici as supposed evidence for the feasibility of direct distributions are factually inapposite when compared to the facts in this case, because each of those three cases involved classes where members could be easily and objectively identified as account holders or purchasers of the defendants' own products or services.  For example, the *Fraley* class consisted of "all persons in the United States . . . who have or have had a Facebook account."  *Fraley v. Facebook, Inc.*, No. CV-11-01726 RS, 2012 WL 6013427, at *2 (N.D. Cal. Dec. 3, 2012); *see also In re Carrier IQ, Inc. Consumer Privacy Litig.*, No. 12-md-02330-EMC, 2016 WL 4474366, at *1 (N.D. Cal. Aug. 25, 2016) (class consisting of persons who "purchased, owned, or were an Authorized User" of a mobile device manufactured or marketed by any defendant); *Zepeda v. Paypal, Inc.*, No. C 10-2500 SBA, 2015 WL 6746913, at *3 (N.D. Cal. Nov. 5, 2015) (class consisting of persons who were "current and former users of PayPal . . . who had an active PayPal account").

## III.    No Conflict Of Interest Undermines The Selected *Cy Pres* Recipients

Should his first argument regarding the appropriateness of *cy pres* distributions fail, as it must, Objector posits a secondary argument attacking five of the six mutually-identified *cy pres* recipients.  Objector's argument essentially posits that any relationship—whatever its form and no matter how attenuated—between a party (or its counsel) and a *cy pres* recipient automatically disqualifies that *cy pres* recipient.  AOB at 16, 36.  Objector's misplaced argument takes two forms: (1) that a *cy pres* recipient should not have "any significant prior affiliation" with class counsel, *id.* at 36; and (2) that any history of donations from a defendant to a *cy pres* recipient constitutes an impermissible "conflict of interest."[14]  *Id.* at 39.  Notably, Objector takes no issue with the identity or mission of any *cy pres* recipient.  Nor does Objector argue that any *cy pres* recipient would fail to further the important goals of the class.  Objector's arguments are nothing more than red herrings.

### A. No disqualifying relationships undermine the proposed *cy pres* recipients

First, Objector argues that because one member of the Plaintiffs' Executive Committee (Brian Strange) serves on the Board of Directors of Public Counsel, one of the six *cy pres* recipients, distributing *cy pres* money to this organization is *de facto* improper.  *Id.* at 17.  The District Court carefully considered Objector's argument in this regard and correctly determined that "the court finds no conflict of interest that

---

[14] Objector's arguments in this regard are nearly identical to his arguments in *Google Referrer*, which the court squarely rejected.  *See Google Referrer*, 87 F. Supp. 3d at 1137–38.

would undermine the selected *cy pres* recipients." JA13. And as the District Court's decision illustrates, no party has any "significant prior affiliation" with any *cy pres* recipient that "would raise substantial questions" concerning the propriety of any *cy pres* recipient's selection, and Objector has demonstrated none. PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION § 3.07 cmt. b (AM. LAW INST. 2010); *see also* JA13. This Court should affirm the District Court's decision.

Public Counsel is one of the nation's largest *pro bono* law firms and it employs about 70 full-time public interest lawyers. JA251 ¶ 4. Public Counsel is administered, managed, and run by its staff under the direction of its President and Chief Executive Officer, former federal district court judge Margaret Morrow. JA251 ¶ 4. Mr. Strange volunteers *pro bono* his time in service on the Board of Directors of Public Counsel, as do the rest of the approximately 70 Board members (who are each private lawyers, mostly from large defense firms). JA251 ¶ 5. Mr. Strange has volunteered his time as part of his commitment to *pro bono* work, this year as Chairman of the Board. JA251– 52 ¶¶ 5–6. Mr. Strange has no responsibility for the day-to-day operation of Public Counsel, no control over any of its funds, and no financial interest in the organization. JA252 ¶ 5. Numerous federal courts have selected Public Counsel as a *cy pres* recipient. Public Counsel has the experience and expertise in the area of Internet privacy that forms the basis of the class' claims and to which the funds are to be directed. *See* JA13 ("In sum, the court finds that the proposed *cy pres* contributions to the proposed recipients an effective and beneficial remedy that bears a substantial

34

nexus to the interests of the Settlement Class."). And while Objector attempts to make Mr. Strange's affiliation with Public Counsel appear as a "conflict of interest," Objector cannot claim that class counsel (or Mr. Strange) have any relationship with the *cy pres* recipients beyond having donated time and energy in service to the underserved.

Having an association with a *cy pres* recipient, without more, does not create an appearance of impropriety. In *In re EasySaver Rewards Litigation*, objectors to a class action settlement alleged that there was an appearance of impropriety where class counsel proposed giving *cy pres* money to USD Law School, a school three of the attorneys involved in the settlement attended. 921 F. Supp. 2d 1040, 1050–51 (S.D. Cal. 2013), *rev'd on other grounds*, 599 F. App'x 274 (9th Cir. 2015). The court held that where the law school was not entitled to any greater award than the other *cy pres* recipients and where there was a "rational connection between the chosen recipients and the nature of the settlement," it was not improper to grant *cy pres* money to a recipient with an association with class counsel. *Id.* Similarly, here, Public Counsel will not be entitled to any greater share of the *cy pres* funds than any other recipient and there is a rational connection between Public Counsel's mission and the nature of the Settlement. JA252 ¶ 7; JA13. The *cy pres* distribution is, therefore, proper. *See also Lane*, 696 F.3d at 821 ("As the 'offspring of compromise,' . . . settlement agreements will necessarily reflect the interests of both parties to the settlement," including the presence of a party employee on the Board of the entity distributing *cy pres* funds);

35

*Miller v. Ghiradelli Chocolate Co.*, No. 12-cv-04936-LB, 2015 WL 758094, at *11 (N.D. Cal. Feb. 20, 2015).

In response to Objector's nearly identical objection in *Google Referrer*, the court stated that "while the potential for a conflict of interest is noted, there is no indication that counsel's allegiance to a particular [*cy pres* recipient] factored into the selection process. Indeed, the identity of the potential *cy pres* recipients was a negotiated term included in the Settlement Agreement and therefore not chosen solely by [class counsel]." *Google Referrer*, 87 F. Supp. 3d at 1138. Similarly, here, the *cy pres* recipients were a negotiated term of the parties' Settlement Agreement, with a specified mechanism for ensuring that one single party does not have control over the selection of the *cy pres* recipients, and Google agreed that the six *cy pres* recipients were reasonable and appropriate after having rejected several other proposed recipients suggested by Plaintiffs. *See* JA133 § 5.3.1; JA252 ¶ 7. As such, there can be no "conflict of interest" with respect to the *cy pres* recipients, and this Court should affirm the District Court's decision in this regard.

### B. Google's previous donations to certain *cy pres* recipients create no conflict and do not diminish the Settlement's value to the class

Finally, Objector takes issue with the proposed *cy pres* donations to four organizations[15] because he claims that "Google is a regular donor" to these

---

[15] The organizations Objector takes issue with are the Berkman Center for Internet & Society at Harvard University ("BCIS"), the Center for Internet & Society at

36

organizations.  AOB at 7.  While Google may have donated to these institutions

previously, that is entirely irrelevant to whether the ***additional*** *cy pres* contributions

that Google will make under the Settlement are fair and reasonable.  *See Miller*, 2015

WL 758094, at *11 ("[T]his court is unaware of any authority that suggests that a

defendant's preexisting charitable contributions should be a factor in analyzing a *cy*

*pres* portion of a common-fund settlement.").  Indeed, pursuant to the Settlement

Agreement, Plaintiffs suggested the initial list of *cy pres* recipients to Google, making

any suggestion that Google is seeking to replace its traditional charitable giving even

further misplaced.  *See* JA133 § 5.3.1; JA252 ¶ 7; *see also* JA281 (Google's counsel:

"[T]he people at [the] company that decide its charitable contribution[s] don't have

anything to do with the settling of cases and how those funds are distributed and

whether or not these entities identified as *cy pres* recipients here and those that have

received donations in the past, whether they may receive a donation in the future has

absolutely nothing to do with the settlement or the [*Girsh*] factors here.  It's

completely unrelated.").

    Objector's argument in this regard appears to be entirely disingenuous.  Google

"provides support to a number of independent third-party organizations whose work

intersects in some way with technology and Internet policy."  *Transparency*, GOOGLE

U.S. PUB. POL'Y, https://www.google.com/publicpolicy/transparency.html (last

---

Stanford University ("CIS"), Berkeley Center for Law & Technology, and Center for
Democracy and Technology (Privacy & Data Project).

visited July 25, 2017).  The list of organizations that Google supports includes the

Competitive Enterprise Institute, of which Objector's Center for Class Action

Fairness is a part.  *Id.*  Objector's unsupported conjecture that Google is using this

Settlement "to simply redirect money that it would have given to a charity anyway" is

unfounded and this Court should affirm the District Court's decision.[16]  AOB at 21.

## CONCLUSION

Objector did not assert any valid argument or present any evidence before the

District Court to suggest that the Settlement was unfair, inadequate, or tainted by any

conflict.  And Objector has failed to show any error, let alone clear error, by the

District Court in approving the Settlement.  Under long-established Third Circuit law,

*cy pres* distributions are proper where direct distributions to class members are

economically infeasible and the District Court below properly determined the

Settlement fell within all applicable precedent.  This Court should affirm the District

Court's order.

///

///

///

---

[16] At least two courts have approved *cy pres* donations to BCIS and at least one court has approved a *cy pres* donation to CIS in class actions where Google was a defendant.  *See Google Buzz*, 2011 WL 7460099, at *3 (approving *cy pres* donations by Google to BCIS and CIS); *Google Referrer*, 87 F. Supp. 3d at 1138 (approving *cy pres* donation by Google to BCIS).

Dated July 28, 2017                          Respectfully submitted,

                                             */s/ Brian R. Strange*

                                             Brian R. Strange (CA Bar No. 103252)
                                             STRANGE & BUTLER LLP
                                             12100 Wilshire Boulevard, Suite 1900
                                             Los Angeles, CA 90025
                                             Telephone: (310) 207-5055
                                             Facsimile: (310) 826-3210
                                             Email: bstrange@strangeandbutler.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1) and Third Circuit Rule 31.1(c), the undersigned hereby certifies:

1.  Excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 11,462 words according to the word count feature of the word processing software used to prepare the brief, in compliance with Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

2.  The brief complies with the type size and typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6).

3.  The text of the electronic brief is identical to the text in the paper copies.

4.  AVAST Antivirus, version 17.5.2303, virus detection program has been run on the electronic copy of this brief and no virus was detected.

Executed on July 28, 2017.

*/s/ Brian R. Strange*
Brian R. Strange

40

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Third Circuit Rule 28.3(d), the undersigned hereby certifies that the attorneys whose names appear on this brief are members in good standing of the bar of this Court.

Executed on July 28, 2017.

*/s/ Brian R. Strange*

Brian R. Strange

## CERTIFICATE OF SERVICE

Pursuant to Third Circuit Rule 31.1, the undersigned certifies that on July 28, 2017, I caused the foregoing brief to be filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system and caused seven (7) copies of the brief to be mailed to the Clerk.

All participants in this action are represented by registered CM/ECF users and will be served by the appellate CM/ECF system.

Executed on July 28, 2017.

*/s/ Brian R. Strange*
Brian R. Strange